STATE OF CONNECTICUT *v.* BALBIR SINGH
(SC 16476)

Sullivan, C. J., and Borden, Norcott, Katz and Zarella, Js.

Argued December 4, 2001—officially released March 26, 2002

*Jeremiah Donovan*, with whom, on the brief, was *Rita Christopher*, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *James G. Clark*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Balbir Singh, appeals, pursuant to our grant of certification, from the judgment of the Appellate Court affirming the trial court's judgment of conviction, rendered after a jury trial, of two counts of arson in the first degree in violation of General Stat-

utes § 53a-111 (a) (1) and (4).[1] The sole issue in this appeal is whether the state's attorney's cross-examination of the defendant and his closing argument to the jury deprived the defendant of a fair trial in violation of his federal constitutional rights.[2] We reverse the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts that the jury reasonably could have found. "Beginning in December, 1994, the defendant rented the first two floors of 1195 Chapel Street in New Haven, the basement of which housed the defendant's Prince Restaurant. The [upper two] floors of the building contained apartments occupied by college students. The defendant's lease was to run until October 31, 1999, but was terminable in the event that the premises were destroyed by fire or explosion. The defendant was experiencing financial difficulty with his restaurant business. In 1995, he had missed [making] some rent payments and needed to take a $10,000 loan to pay his employees. In February, 1996, the defendant admitted that his business was not 'particularly good' and 'just pretty much shaky.' By the spring of 1996, the defendant was driving a [taxicab] because his restaurant business was not doing well enough to meet his debts.

"On July 6, 1996, the night of the incident at issue, the doorman at the defendant's apartment complex observed the defendant and his father enter the lobby at about 11 p.m., which comported with their usual

---

[1] General Statutes § 53a-111 (a) provides in relevant part: "A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section 53a-100, he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied . . . or (4) at the scene of such fire or explosion a peace officer or firefighter is subjected to a substantial risk of bodily injury."

[2] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

routine. The doorman found it unusual, however, that the defendant approached him and asked him for the time, despite the fact that there was a large clock on the wall. The doorman also noticed while he was speaking with the defendant, that the defendant appeared to be looking at the security monitors, which cover four of the six entrances to the building.

"At about midnight on July 7, 1996, Christopher Gansen, a student who lived near the Prince Restaurant, was walking home and saw a man of Asian-Indian descent who appeared to be agitated and nervous. The man crossed the street in front of Gansen, having come from the vicinity of the Prince Restaurant. According to Gansen, the streetlighting was adequate and allowed him to see the man's facial features.

"At [12:17] a.m. on July 7, 1996, firefighters from the New Haven fire department arrived at 1195 Chapel Street to find black smoke coming from the building. The firefighters gained entry by forcing a locked rear door and by smashing open a rear glass door. After putting out the fire in the basement, the firefighters forced open the front door and broke open the first floor windows of the building to examine the first floor.

"At 1:30 a.m., Frank Dellamura, a fire investigator in the office of the New Haven fire marshal, arrived and interviewed firefighters and examined the building. [There was no one in the building.] He observed that the doors and windows of the building had been forced or smashed in, and confirmed from firefighters on the scene that they were responsible for the broken windows and the forced doors.

"Dellamura noted the black smoke, which suggested that an accelerant had been used to start the fire. On the basis of burn patterns and other physical evidence, [he] concluded that the fire had started in the basement. . . . Dellamura also detected a noticeable gasoline

odor . . . ." *State* v. *Singh*, 59 Conn. App. 638, 640–41, 757 A.2d 1175 (2000). He then brought some of the debris from the floor of the building outside to the parking lot where a state trooper and Louise, a state police canine that had been trained to detect petroleum based products, were located. Louise alerted to each of the items brought out by Dellamura, indicating the presence of such a petroleum based product.[3] Dellamura also discovered that the fire alarm panel on the floor above the basement had been tampered with so that it had been disconnected from its battery backup power. He concluded that the fire had been intentionally set. Joseph Pettola, a member of the fire investigation unit of the New Haven police department, interviewed Gansen at the fire scene and obtained a description of the man he saw leaving the vicinity of the Prince Restaurant.

"On July 7, 1996, Dellamura and [Pettola] . . . visited the defendant at his apartment, which was two blocks from the fire scene. [They] informed the defendant that there had been a fire in his restaurant. Before the two men told the defendant that arson was suspected, the defendant became hysterical, exclaiming that the fire had been set by a former restaurant employee who had been fired the previous week.[4] The defendant claimed that he and his father had left the restaurant at 11 p.m. the previous night and that [thereafter] he had remained in his apartment all night." Id., 641–42.

The defendant, visibly anxious to go to the restaurant, began to leave his apartment while still wearing his sandals. "Dellamura suggested that because of the

---

[3] Gas chromatography and gas chromatography mass spectometry tests later confirmed that a petroleum based product consistent with gasoline was indeed present on the items.

[4] Evidence was introduced at trial that the former employee, Raj Dev, had been working out-of-state on the night of the fire.

messy nature of the fire scene, the defendant should instead wear shoes. The defendant ignored Dellamura's suggestion and wore [his] sandals to the scene of the fire. The property manager of the building [Gary Dingus], who also was inspecting the fire scene, noticed that the defendant was wearing sandals at the scene of the fire.

"On July 8, 1996, Dellamura and Pettola returned to the defendant's apartment [along with a police detective and the police canine Louise]. After the defendant consented to a search of his apartment, [Louise] alerted the police to a pair of black loafers in a closet. Tests later confirmed the presence of gasoline on the loafers. The defendant admitted to owning the shoes [but] claimed that they must have been contaminated by gasoline when he wore them to inspect the fire scene the previous day with the investigators. The investigators, however, recalled that the defendant had worn sandals when he visited the fire scene.

"On July 16, 1996, Dellamura and Pettola visited the apartment of Gansen, the student who had seen an Asian-Indian man in the vicinity of the Prince Restaurant on the night of the fire. Gansen was shown an array of six photographs of Asian-Indian males. He instantly recognized the defendant as the man he had seen on the night of the fire at about 12 a.m. and subsequently made an in-court identification of the defendant." Id., 642–43.

The jury returned guilty verdicts on two counts of arson in the first degree in violation of § 53a-111 (a) (1) and (4).[5] Thereafter, the trial court sentenced the defendant to a total effective term of twenty-five years

---

[5] The defendant was acquitted of a third count of first degree arson in violation of § 53a-111 (a) (3), which applies when a person starts a fire or explosion "for the purpose of collecting insurance proceeds for the resultant loss . . . ."

imprisonment, execution suspended after ten years, and five years probation. The defendant appealed from the judgment of conviction to the Appellate Court, claiming, inter alia,[6] that prosecutorial misconduct during the course of cross-examination and closing argument deprived him of a fair trial. The Appellate Court concluded that the state's attorney's conduct was not improper and affirmed the judgment of conviction. Id., 649, 654. This appeal followed. Additional facts will be set forth as necessary.

Because the defendant failed to object to the alleged prosecutorial misconduct at trial, he may prevail only if he satisfies all four requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[7] We conclude that he has satisfied all four prongs of *Golding*.

"To prove prosecutorial misconduct, the defendant must demonstrate substantial prejudice. *State* v. *Richardson*, 214 Conn. 752, 760, 574 A.2d 182 (1990); *State* v. *Northrop*, 213 Conn. 405, 421, 568 A.2d 439 (1990). In

---

[6] The defendant made two other claims in the Appellate Court: (1) that he was deprived of a fair trial because of comments made by the court-appointed translator; and (2) that he was deprived of a fair trial because the admission of certain expert testimony violated his right to confrontation. *State* v. *Singh*, supra, 59 Conn. App. 649–50. The Appellate Court rejected these claims. Id., 650, 654. The defendant raised all three claims in his petition for certification to this court. We granted the defendant's petition limited to the following issue: "Did the prosecutor's cross-examination of the defendant and his closing argument to the jury constitute prosecutorial misconduct in violation of the defendant's federal constitutional right to a fair trial?" *State* v. *Singh*, 255 Conn. 935, 767 A.2d 1214 (2001).

[7] In *Golding*, we determined that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." *State* v. *Golding*, supra, 213 Conn. 239–40.

order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process. *Darden* v. *Wainwright,* 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) . . . ." (Citation omitted.) *State* v. *Alexander,* 254 Conn. 290, 303, 755 A.2d 868 (2000).

"Prosecutorial misconduct may occur in the course of cross-examination of witnesses; *State* v. *Hafner,* 168 Conn. 230, 249, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975); and may be so clearly inflammatory as to be incapable of correction by action of the court. Id., 252–53. In such instances there is a reasonable possibility that the improprieties in the cross-examination either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal. Id., 253." (Internal quotation marks omitted.) *State* v. *Williams,* 204 Conn. 523, 538–39, 529 A.2d 653 (1987). Moreover, "prosecutorial misconduct of constitutional proportions may arise during the course of closing argument, thereby implicating the fundamental fairness of the trial itself . . . ." (Internal quotation marks omitted.) *State* v. *Burton,* 258 Conn. 153, 165, 778 A.2d 955 (2001).

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. . . . Included among those factors are the extent to which the misconduct was invited by defense conduct or argument; *State* v. *Falcone,* 191 Conn. 12, 23, 463 A.2d 558 (1983); the severity of the misconduct; see *United States* v. *Modica,* 663 F.2d 1173, 1181 (2d Cir. 1981), cert. denied, 456 U.S. 989, 102 S. Ct. 2269, 73 L. Ed. 2d 1284 (1982); the frequency of the misconduct; *State* v. *Couture,* 194 Conn. 530, 562–63, 482 A.2d 300 (1984), cert. denied,

469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985) . . . the centrality of the misconduct to the critical issues in the case; *Hawthorne* v. *United States*, 476 A.2d 164, 172 (D.C. App. 1984); the strength of the curative measures adopted; *United States* v. *Modica*, supra, 1181 . . . and the strength of the state's case. See [id.] . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Whipper*, 258 Conn. 229, 262–63, 780 A.2d 53 (2001).

As is evident upon review of these factors, it is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. *Smith* v. *Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982); *State* v. *Alexander*, supra, 254 Conn. 303. We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor "is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to

consider." (Internal quotation marks omitted.) *State* v. *Alexander*, supra, 302.

The defendant's claims of prosecutorial misconduct fall within four categories of proscribed conduct: (1) questions and comments on the veracity of other witnesses' testimony; (2) personal expressions of opinion on evidence; (3) references to matters not in evidence; and (4) appeals to the emotions, passions and prejudices of the jurors. The defendant does not claim that any one category of conduct alone is a sufficient basis for reversal. We therefore address each in turn to determine whether the particular conduct was improper before determining whether the impropriety, if any, deprived the defendant of a fair trial.

I

The defendant first contends that during cross-examination the state's attorney improperly compelled him to characterize the testimony of other witnesses, and then improperly emphasized that testimony in closing argument. The following additional facts are relevant to our analysis.

The prosecution's theory of the case was that the defendant had committed arson because of his financial difficulties. In support of this theory, the state offered two witnesses who testified that the defendant had told them that his business was "slow" and "[not] particularly good . . . just pretty much shaky." A third witness, Joel Young, a partner in the business that held the defendant's lease, testified that the defendant had failed to pay his May, 1995 rent. When the defendant disputed that he had made those statements, the state's attorney asked the defendant whether the testimony was incorrect or made up, or wrong.[8] In addition, the

[8] The defendant testified on cross-examination that he did not tell Ronald Moore, the New Haven fire marshal, and Dingus, the property manager of the damaged premises, that his business was bad, only that it was "so and so." The following exchange between the state's attorney and the defen-

state offered the testimony of Naresh Komal, a business-man from the Asian-Indian community, who testified that he had loaned the defendant $10,000 and that the defendant had paid back only $6000. When the defendant testified on cross-examination that he had paid back the entire loan, the state's attorney asked: "So is it your claim that Mr. Komal came into court and lied when he said that you still owed him over $4000 of that $10,000?" The defendant responded, "Yes."

The sole piece of physical evidence linking the defendant to the crime scene was a pair of the defendant's shoes, which tested positive for the presence of a petroleum based product consistent with gasoline. The defendant contended that the shoes had gasoline on them because he wore them regularly when filling his taxicab tank with gasoline and that he had, in fact, worn the shoes to fill the tank just hours before the police seized the shoes.[9] On cross-examination, the state's attorney questioned the defendant as follows:

dant occurred:

"Q. So their recollection is incorrect or they are making it up, right, because that is not their testimony. They didn't say it was so and so, they said you told them it was bad, correct?

"A. Right.

"Q. But that is not what you said?

"A. Anybody ask how the business, so so."

When questioning the defendant about Young's testimony, the state's attorney asked:

"Q. Do you recall [Young] testifying that you had missed the May '95 rent? Do you remember hearing him testifying in court that you had not paid your May, 1995 rent?

"A. May, maybe. I don't remember May. . . .

"Q. And do you have any reason to question his memory in that issue?

"A. I'm sorry, I don't understand the question.

"Q. Do you claim that he's wrong about that?

"A. I'm not."

[9] Jack Hubbal, the head of the chemistry section of the state police forensic laboratory, testified that the test samples on the defendant's shoes revealed the presence of gasoline but that he was incapable of distinguishing the type or source of gasoline.

"Q. It is your testimony here, is it not, that you were not present when the dog alerted to your shoes, right?

"A. I was in the apartment.

"Q. But you didn't see it happen?

"A. No.

"Q. And you recall that's different than what the people who were handling the dog said and [w]hat the detective said, right? Do you recall that's different than what they testified to?

"A. Yes.

"Q. And are they lying about that? You shrugged your shoulders. Does that mean I don't know?

"A. I don't know.

"Q. In fact, when you saw the dog alert to them and they said the dog has said there is some kind of flammable [liquid] on those shoes you immediately said 'I wore those shoes to the restaurant after I talked to you last night,' didn't you? Yes or no? Did you understand the question?

"A. No. . . .[10]

"Q. The police told you they believed there was some kind of flammable liquid on your shoe[s]?

"A. They don't tell me nothing. . . .

"Q. Did they tell you why they wanted to seize your shoes?

---

[10] It is unclear whether the defendant was denying that he had made the statement or whether he was responding that he did not understand the question. The defendant had testified previously that he did not remember which shoes he had worn to the fire scene. Both Dellamura and Pettola testified, however, that the defendant stated that he had worn the shoes to inspect the restaurant upon being told that the police were going to seize those shoes.

"A. Because I gave them the shirt, my pants and they said the dog—they told me the dog pointed [to these] shoes, we have to take it. I said no problem, take it.

"Q. So when they testified that in fact they informed you that they believed there was gasoline on the shoes, they were wrong or lying, correct?[11]

"A. They told me they want to take shoes. I say okay."

In his closing argument, the state's attorney continued to underscore his view of the defendant's characterization of these witnesses and Gansen when he identified the defendant as the man he had seen near the crime scene: "What does [the defendant] tell you? He insists on telling you that he's telling the truth. At the most damaging point in his testimony, he remembers all these details about that night but he [forgets] exactly what he said when the dog alerts [to] his shoe. And why does he have to tell you that? He has to tell you that he doesn't remember it because otherwise he has to directly call Pettola and Dellamura liars when they tell you . . . what [the defendant] does [when] the dog alerts on the shoes in his presence, they told him what the dog—what that means and [the defendant] says 'I wore these back to the scene.'

\* \* \*

"So everyone else lies. [Gansen] lies, Dellamura, Pettola, Komal, Dingus [the property manager] they all

---

[11] The record does not indicate clearly that, in fact, the defendant had been told that the police canine responded to the shoes specifically because they contained the scent of a gasoline type product. The state's attorney asked Pettola to identify certain items seized during the search and then inquired: "Now, you mentioned that the [police canine] was there with you and why was the dog there?" Pettola replied: "Basically to search out any possible petroleum based products on [the defendant's] clothes or any clothing in the apartment." It is uncertain whether the state's attorney's question was intended to refer to a conversation Pettola had had with the defendant or to reiterate prior testimony regarding the police canine's role in the search.

must be lying because you're supposed to believe this defendant, this defendant who is the only person who continually tells you and almost always at key moments in the testimony when there is some question that is . . . hard to answer . . . without looking like [he is] guilty, that is when he said 'I'm telling the truth' . . . .

\* \* \*

"Again, remember that if you buy the argument that [Gansen] couldn't have done it, couldn't have seen what he says he saw, then you have to conclude that [Gansen] lied."

We previously have not had the opportunity to address the well established evidentiary rule that it is improper to ask a witness to comment on another witness' veracity. See, e.g., *United States* v. *Sanchez*, 176 F.3d 1214, 1219–20 (9th Cir. 1999); *United States* v. *Gaines*, 170 F.3d 72, 81 (1st Cir. 1999); *United States* v. *Lin*, 101 F.3d 760, 769 (D.C. Cir. 1996); *United States* v. *Scanio*, 900 F.2d 485, 493 (2d Cir. 1990); *Knowles* v. *State*, 632 So. 2d 62, 65–66 (Fla. 1993); *People* v. *Riley*, 63 Ill. App. 3d 176, 184–85, 379 N.E.2d 746 (1978); *State* v. *Manning*, 270 Kan. 674, 19 P.3d 84, 103 (2001); *Commonwealth* v. *Martinez*, 431 Mass. 168, 177, 726 N.E.2d 913 (2000); *State* v. *Flanagan*, 111 N.M. 93, 97, 801 P.2d 675 (App. 1990); *Burgess* v. *State*, 329 S.C. 88, 91, 495 S.E.2d 445 (1998); *State* v. *Emmett*, 839 P.2d 781, 787 (Utah 1992); *State* v. *Casteneda-Perez*, 61 Wash. App. 354, 362, 810 P.2d 74 (1991).[12] A few of these courts have drawn a distinction between using the words "wrong" or "mistaken" rather than "lying" in questions and closing arguments, concluding that the former

[12] Our research has revealed only two courts that have adopted an unequivocal rule that the question, "Is the witness lying?" is proper. See *Whatly* v. *State*, 270 Ga. 296, 301, 509 S.E.2d 45 (1998), cert. denied, 526 U.S. 1101, 119 S. Ct. 1582, 143 L. Ed. 2d 676 (1999); *Fisher* v. *State*, 128 Md. App. 79, 149–52, 736 A.2d 1125 (1999).

terms are not improper because they merely "[highlight] the objective conflict without requiring the witness to condemn the prior witness as a purveyor of deliberate falsehood, i.e., a 'liar.' " *United States* v. *Gaind*, 31 F.3d 73, 77 (2d Cir. 1994); see also *United States* v. *Gaines*, supra, 82 (use of word "wrong" proper in present case but court declines to address whether it would be in all instances); but see *State* v. *Flanagan*, supra, 97 (asking if another witness is mistaken is improper because it "may amount to simply argument to the jury, in which the prosecutor improperly suggests that the only possible alternatives are that either the defendant or the witness is a liar").

Several reasons underlie the prohibition on such questions. First, it is well established that "determinations of credibility are for the jury, and not for witnesses." (Internal quotation marks omitted.) *United States* v. *Lin*, supra, 101 F.3d 769; *United States* v. *Forrester*, 60 F.3d 52, 63 (2d Cir. 1995) ("[a]s a matter of law, '[t]he credibility of witnesses is exclusively for the determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial' "); *United States* v. *Akitoye*, 923 F.2d 221, 224 (1st Cir. 1991) ("it is not the place of one witness to draw conclusions about, or cast aspersions upon, another witness' veracity"); *State* v. *Aponte*, 249 Conn. 735, 756, 738 A.2d 117 (1999) (credibility of witnesses is within exclusive purview of jury). Consequently, questions that ask a defendant to comment on another witness' veracity invade the province of the jury. *United States* v. *Gaines*, supra, 170 F.3d 81; *State* v. *Manning*, supra, 19 P.3d 103; *State* v. *Casteneda-Perez*, supra, 61 Wash. App. 362; see also *State* v. *Schleifer*, 102 Conn. 708, 724, 130 A. 184 (1925) ("[i]t is never permissible, though often done, to ask a witness to characterize the testimony or statement of another witness"). Moreover, "[a]s a general rule, [such] ques-

tions have no probative value and are improper and argumentative because they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence." *State* v. *Pilot*, 595 N.W.2d 511, 518 (Minn. 1999); accord *Commonwealth* v. *Ward*, 15 Mass. App. 400, 401, 446 N.E.2d 89 (1983) (improper to ask question designed to cause one witness to characterize another's testimony as lying); *State* v. *Flanagan*, supra, 111 N.M. 97 (same); *State* v. *Emmett*, supra, 839 P.2d 787 (question to defendant of whether victim lied in testimony improper because it sought information beyond defendant's competence).

Second, questions of this sort also create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied. *State* v. *Casteneda-Perez*, supra, 61 Wash. App. 362; see also *State* v. *Flanagan*, supra, 111 N.M. 97 (questions may mislead jury that only alternative is that defendant or witness is lying). This risk is especially acute when the witness is a government agent in a criminal case. *United States* v. *Fernandez*, 145 F.3d 59, 64 (1st Cir. 1998) (finding it unfair to force witness to choose between recanting own testimony and calling law enforcement officer a liar "[g]iven the faith the jury may place in the word of a law enforcement officer"); *United States* v. *Weiss*, 930 F.2d 185, 195 (2d Cir.), cert. denied, 502 U.S. 842, 112 S. Ct. 133, 116 L. Ed. 2d 100 (1991) (explaining that special concern may be warranted in such cases because some people may believe that government agent has "heightened credibility"); *Commonwealth* v. *Ward*, supra, 15 Mass. App. 402 (same). A witness' testimony, however, "can be unconvincing or wholly or partially incorrect for a number of reasons without any deliberate misrepresentation being involved"; *State* v. *Casteneda-Perez*, supra, 363; such as "misrecollection, failure of recollection or other innocent reason." *United*

*States* v. *Narciso*, 446 F. Sup. 252, 321 (E.D. Mich. 1977); see also *State* v. *Emmett*, supra, 839 P.2d 787 (question regarding victim's veracity prejudicial because it suggests that "witness is committing perjury even though there are other explanations for the inconsistency . . . [and] puts the defendant in the untenable position of commenting on the character and motivations of another witness who may appear sympathetic to the jury").

Similarly, courts have long admonished prosecutors to avoid statements to the effect that if the defendant is innocent, the jury must conclude that witnesses have lied.[13] *United States* v. *Richter*, 826 F.2d 206, 208 (2d Cir. 1987); *United States* v. *Reed*, 724 F.2d 677, 681 (8th Cir. 1984); *United States* v. *Nwankwo*, 2 F. Sup. 2d 765, 769 (D. Md. 1998); *State* v. *Williams*, 41 Conn. App. 180, 184–85, 674 A.2d 1372, cert. denied, 237 Conn. 925, 677 A.2d 950 (1996); see also *United States* v. *Cornett*, 232 F.3d 570, 574 (7th Cir. 2000) (limiting this rule to arguments in which express, direct link is made between acquittal and conclusion that witnesses lied). The reason for this restriction is that "[t]his form of argument . . . involves a distortion of the government's burden of proof." *United States* v. *Reed*, supra, 681; accord *United States* v. *Vargas*, 583 F.2d 380, 387 (7th Cir. 1978) (noting that such comments excluded possibility that jury could have concluded only that witnesses were *probably* truthful and defendant was *probably* lying, thereby preventing jury from "return[ing] a verdict of not guilty because the evidence might not be sufficient to convict the defendant beyond

---

[13] Although this principle is cited most often when the testimony of police officers or government agents has been implicated, the rule is not limited to such witnesses. See *United States* v. *Sullivan*, 85 F.3d 743, 750 (1st Cir. 1996) (expressly rejecting such distinction); see also *United States* v. *Whitney*, 787 F.2d 457, 461 (8th Cir. 1986) (concluding that argument, which stated that jury must conclude that government's witnesses, postal employees, must have lied in order to acquit defendant, was improper).

a reasonable doubt"); *United States* v. *Nwankwo*, supra, 769 (same). Moreover, like the problem inherent in asking a defendant to comment on the veracity of another witness, such arguments preclude the possibility that the witness' testimony conflicts with that of the defendant for a reason other than deceit. Cf. *United States* v. *Narciso*, supra, 446 F. Sup. 321; *State* v. *Emmett*, supra, 839 P.2d 787.

In the present case, the state's attorney's argument stated, in essence, that the only way the jury could conclude that the defendant had not set the fire was if it determined that five government witnesses had lied. Moreover, the state's attorney particularly emphasized this argument with respect to Gansen's identification by expressing his own personal belief that the jury had in fact concluded that Gansen had not lied.[14]

The state recognizes these rules but asks this court to adopt the minority position, which the Appellate Court applied. That position provides an exception to the prohibition of questions and comments on witnesses' veracity when the defendant's testimony "is the opposite of or contradicts the testimony of other witnesses," thereby presenting a "basic issue of credibility . . . [that *cannot*] be attributed to defects or mistakes in a prior witness' perception or inaccuracy of memory, rather than to lying." (Emphasis added.) *State* v. *Singh*, supra, 59 Conn. App. 645; accord *State* v. *Morales*, 198 Ariz. 372, 375, 10 P.3d 632 (App. 2000); *State* v. *Pilot*,

---

[14] The state's attorney remarked: "I submit to you, your determination of [Gansen's] credibility is not going to be that he would just [lie] because he was here and [the defendant] was the man in the courtroom. I think your determination is that [Gansen] would have said [that it] looks like him some but I don't know, or words to that effect, [but] that's not what he said." While the state's attorney may have intended to make the point that Gansen's identification was unequivocal, the proper means of doing so would have been to cite Gansen's actual testimony. Cf. *State* v. *Whipper*, supra, 258 Conn. 264–65 n.14 and accompanying text (comments regarding unwavering witness identification proper).

supra, 595 N.W.2d 518; *State* v. *Hart,* 303 Mont. 71, 80–81, 15 P.3d 917 (2000); *People* v. *Overlee,* 236 App. Div. 2d 133, 139, 666 N.Y.S.2d 572 (1997). The state contends that such an exception is permissible because, under these circumstances, the jury's role is not usurped because it still must decide ultimately which testimony to believe. This argument fails to demonstrate, however, why an exception to the rule is neces sary. The state's objective of "highlighting" inconsistencies in testimony may be accomplished by other, proper means. Moreover, we reject this exception because, as we previously have emphasized, testimony may be in direct conflict for reasons other than a witness' intent to deceive. *United States* v. *Narciso,* supra, 446 F. Sup. 321; *State* v. *Casteneda-Perez,* supra, 61 Wash. App. 363. It would be unwise, in our view, to make the application of this exception predicated on such a difficult distinction, which is relegated properly to the jury.[15]

---

[15] It is noteworthy that in two of the four cases cited by the state, the defendant's theory of the case was that the witness had in fact lied. See *State* v. *Pilot,* supra, 595 N.W.2d 518; *People* v. *Overlee,* supra, 236 App. Div. 2d 137. Therefore, the *only* possible theory for the jury to consider in those cases was whether the testimony conflicted because the witness indeed had lied. The defendant in the present case never made such a claim. In fact, when asked on cross-examination whether various witnesses had lied, the defendant claimed that only one witness, Komal, had lied.

The conflict between Gansen's testimony and the defendant's claim that he was at home at the time the fire was set illustrates precisely why counsel should not be left to determine whether a conflict in testimony is present due to deliberate deceit. Defense counsel had argued that Gansen had made a good faith mistake in identifying the defendant as the man he had seen leaving the vicinity of the crime scene. In light of the fact that courts have recognized that eyewitness identification may be unreliable; see *Arizona* v. *Youngblood,* 488 U.S. 51, 72 n.8, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988) (Blackmun, J., dissenting) (noting court's recognition that eyewitness identification is " 'inherently suspect' " and " 'notoriously unreliable' "); *State* v. *Kemp,* 199 Conn. 473, 478, 507 A.2d 1387 (1986) ("in many instances [eyewitness] identifications may be unreliable"); we fail to understand how the state can assert unequivocally that the conflicting testimony *cannot* be attributed to a defect or mistake in Gansen's perception or memory.

Therefore, we reject the state's invitation to carve out an exception to the rule that a witness may not be asked to characterize another witness' testimony as a lie, mistaken or wrong.[16] Moreover, closing arguments providing, in essence, that in order to find the defendant not guilty, the jury must find that witnesses had lied, are similarly improper.[17] Because the state's attorney's conduct in this case fell within these prohibited categories, we conclude that his questions and comments were improper.

## II

We next address the defendant's claim that the state's attorney improperly expressed his personal views during closing arguments, in essence serving as an unsworn witness in support of those views. It is well settled that, "in addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of the argument." (Internal quotation marks omitted.) *State* v. *Robinson*, 227 Conn. 711, 746, 631 A.2d 288 (1993); accord *State* v. *Brown*, 256 Conn. 291, 309–10, 772 A.2d 1107 (2001). Moreover, "[i]t does not follow . . . that every use of rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) *State* v. *Brown*, supra, 310.

---

[16] We do not, therefore, make the distinction between using the word "wrong" as opposed to "lying." Cf. *United States* v. *Gaines*, supra, 170 F.3d 82; *United States* v. *Gaind*, supra, 31 F.3d 77. Although questioning whether a witness' testimony is wrong may, at first blush, seem less egregious, we conclude that it is nonetheless improper because it requires the witness to characterize testimony and may lead to the same problematic results. *State* v. *Flanagan*, supra, 801 P.2d 679.

[17] This conclusion does not affect our holding in *State* v. *Burton*, supra, 258 Conn. 170, wherein we concluded that the state properly may argue that witnesses had no apparent motive to lie when discussing a contested issue of credibility.

"The parameters of the term zealous advocacy are also well settled. The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Citations omitted; internal quotation marks omitted.) *State* v. *Whipper*, supra, 258 Conn. 263; see also A.B.A., Standards for Criminal Justice, Prosecution Function and Defense Function (3d Ed. 1993) standard 3-5.8 (b), p. 106.

The state's attorney did on several occasions assert his personal view of the evidence.[18] Some of these com-

[18] The state's attorney made the following comments, the contested portions of which are italicized: "This is the one chance I get to tell you *how I think this evidence all fits together* and *how I think you're going to decide that it all fits together.*

\* \* \*

"Can you infer . . . that with all of these difficulties that $60,000 would be a nice way to pay back all these debts, that because [the defendant] didn't know about [the insurance policy's] technical exclusions . . . because he paid no attention to his policy . . . is it reasonable to infer that he burned it down to get that insurance money? *I think you might conclude that it was.*

\* \* \*

"*That's why you're going to conclude, I believe, that [Gansen's] positive and sure identification of the defendant is correct. . . . The fact is I believe you already concluded that this defendant was at the restaurant* so let's look to some of the other reasons he was over there, the defendant who committed these other acts.

"First of all, nobody else had a motive. *You don't believe that Dev Raj stuff* because we know where [Raj] was. He was three hours away in Allentown, Pennsylvania and *I would say that tens of thousands of dollars worth of insurance is better motive than being fired and getting a job right away somewhere else.*"

In his final argument, after defense counsel's closing argument, the state's

ments focused on the discrepancy that had been highlighted in defense counsel's closing argument between the description Gansen had given to the investigator at the fire scene and the defendant's actual physical appearance.[19] The state's attorney remarked that he considered the defendant's physical build to be consis-

attorney commented as follows, with the contested portions once again italicized:

"*Let me hit a few of the highlights where I think your recollection and what you just heard is going to be different.* . . . I don't get where the argument comes from about how the alarm couldn't have been working when [Gansen] was walking by because in February the alarm was fixed so that [the defendant] could get his liquor permit renewed, so there were working alarms there. What were they? *Even though you got pictures that there are bells attached,* what did Fire Marshal [Ronald] Moore tell you? He told you [there] were horns and lights, *which means to me* that the bells weren't working because he said no bells, horns and lights."

We note that two of the aforementioned comments, although improper, could not be considered prejudicial. With respect to the remarks concerning the defendant's motive to set the fire to collect on his insurance policy, the jury had rejected this motive, as evidenced by its acquittal of the defendant on the charge of arson for the purpose of collecting insurance proceeds. See footnote 5 of this opinion. Similarly, with respect to the comment that the jury did not believe that Dev could have set the fire, there was uncontroverted testimony that he was in Pennsylvania at the time of the fire.

We also mention one other comment that the defendant claims was improper. The state's attorney remarked: "If I come home from somewhere and come back to my home after a day or two away . . . and I find my house burned down to the ground, I'm going to [say] 'Oh my gosh' but I'm *not going to [say that] someone burned my house down even if I have a neighbor who doesn't like me,* but I'm going to say that if I did it." These comments, while not in the form that we encourage counsel to adopt, were not improper. See *People* v. *Morgan,* 66 N.Y.2d 255, 259, 487 N.E.2d 258, 496 N.Y.S.2d 401 (1985), cert. denied, 476 U.S. 1120, 106 S. Ct. 1984, 90 L. Ed. 2d 666 (1986) (contrast between defendant's reaction and what prosecutor's reaction would have been in same circumstances not clearly improper). We caution, however, that a better form of argument would have been to make this contrast in terms of how a "reasonable person" would react upon receiving such news.

[19] Gansen testified on cross-examination that he had described the man to the investigator as forty to fifty years old and slightly heavyset. The defendant testified that he was thirty-six at the time of trial, which would have made him thirty-four at the time of the fire. Gansen agreed during cross-examination that the defendant did not appear to be particularly heavyset.

tent with Gansen's description and that neither he nor most people of Gansen's age could guess a person's age with accuracy.[20] By doing so, the state's attorney impermissibly vouched for Gansen's credibility. See *State* v. *Alexander*, supra, 254 Conn. 305 (prosecutor improperly implied that "victim testified truthfully because she is young and therefore honest").

The state contends that, because the state's attorney prefaced his argument by explaining that his use of the first person when drawing factual inferences and reasonable conclusions was a rhetorical device that was not intended to divert the jury from making its own conclusions and inferences, the comments were not improper.[21] We disagree with this contention. The prefatory remarks do not transform an otherwise improper form of argument into a proper one. They may, however, have some bearing on our determination as to whether an improper argument was prejudicial.

---

[20] The state's attorney first remarked regarding Gansen's description of the defendant: "[The defendant] says he's 5'10" and 180. I consider that pretty husky size. It is the size [Gansen] said he was." He later stated: "The only vagueness has to do with a little bit of age. I submit to you that most people at twenty-one don't do that well. I can tell you I couldn't tell you . . . how old any of you were. A little bit of height, within an eighth [of an] inch or two, I don't think most people can do that."

[21] The state's attorney remarked, shortly after beginning his closing argument: "This is the one chance I get to tell you how I think this evidence all fits together and how I think you're going to decide that it all fits together. . . . Now, as I go through my argument, I need necessarily to talk about the facts. When I do that, it doesn't mean I'm trying to take away your job. Your job is to find the facts. You have been told that several times. I'm sure you understand it. So if I say this happened, understand that while I certainly have opinions about this, my opinions are totally unimportant. It is your determination of the facts. . . . [E]verytime I say something happened, supply the phrase 'I submit to you that you will conclude from the evidence that something happened.' I can save a lot each time if I don't have to put that phrase in front every time I mention something happened, but that is what I am saying, that's what is important. It is your job, not mine."

## III

The next claimed impropriety is that, in his closing argument, the state's attorney referred to facts not in evidence. We reject all but two of the defendant's claimed improprieties in this category of misconduct because the remarks were either supported by evidence, were matters of common knowledge, or had been invited by defense counsel's remarks.[22]

[22] The first allegedly improper comment was made when the state's attorney addressed the charge that the defendant intentionally had set the fire and thereby had put the firefighters at a substantial risk of injury: "Probably many of you know gasoline is heavier than air. It sits down below level [and] the chance of a backdraft, as [Lieutenant Thomas Neville] explained it, just a flash, that . . . [is] much more likely in an accelerant fire than in a wood fire. It is that kind of danger to the fireman that is part of what one of the charges here is about." The first part of this statement was proper because it is reasonable to assume that most people would know that gasoline is heavier than air. See *State* v. *Rolli*, 53 Conn. App. 269, 281, 729 A.2d 245, cert. denied, 249 Conn. 926, 733 A.2d 850 (1999) (argument properly appealed to jury's common sense); A.B.A., supra, standard 3-5.9, p. 109 (stating that counsel may argue facts outside record if "matters of common public knowledge based on ordinary human experience"). The second part of the statement also was proper because Neville had testified that an accelerant fire is more dangerous than a wood fire because it gets the fire going more quickly and that the fire could have created the risk of a backdraft.

The second allegedly improper comment was made by the state's attorney after defense counsel had asserted in his closing argument that a person in credit card debt, such as the defendant, would have filed for bankruptcy or abandoned his business had his debt been that serious, rather than destroy the business. The state's attorney commented: "Could he have filed for bankruptcy? I don't know. Do you have any evidence about filing for bankruptcy or whether he even knew it existed? No. So you can't speculate about why he didn't file for bankruptcy. Maybe he had already done it once. But see, we don't have any evidence about any of that so you can't speculate about it. Maybe he didn't know about it. It doesn't matter what he didn't do, it matters what we have shown that he did do and what he had motive to do." This comment was invited by defense counsel's argument and, therefore, was not improper. See *State* v. *Burton*, supra, 258 Conn. 170–72; *State* v. *Robinson*, supra, 227 Conn. 746.

The third allegedly improper comment referred to a document that had been excluded by the court upon defense counsel's motion: "It also happened to be in February that Mr. Young testified that they had to make an arrangement with [the defendant] to change the rent. Now [the defendant] says it

"A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument." (Internal quotation marks omitted.) *State* v. *Whipper*, supra, 258 Conn. 275; see also A.B.A., supra, standard 3-5.9, p. 109. "[T]he state may [however] properly respond to inferences raised by the defendant's closing argument." *State* v. *Robinson*, supra, 227 Conn. 746.

As we previously noted, the defense had contended that the police canine, Louise, had alerted to the defendant's shoes because the shoes had been exposed to gasoline when the defendant wore them earlier that day to the filling station. To controvert this theory, the state's attorney commented: "Well, all by itself, it doesn't prove anything, but it's an amazing coincidence this dog didn't alert to anybody else's shoes. I think we can safely assume that Dellamura and Pettola pump gas, they are in gas stations, but even if we couldn't, the fact is that this is the guy whose shoes had gasoline on them and it is a gasoline fire." There was no evidence that Dellamura and Pettola ever pumped their own gas, nor more importantly, that they recently had pumped gas while wearing the same shoes that they had worn

is a different time. [Young] had the document in front of him and said that it was at that time." The context in which this comment was made does not indicate that the state's attorney "deliberately intended to undermine the rulings of the trial court to the prejudice of the defendant"; *State* v. *Ubaldi*, 190 Conn. 559, 575, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); or improperly suggested that evidence of guilt existed which, because of the defendant's objection, could not be brought before the jury. *State* v. *Satchwell*, 244 Conn. 547, 581, 710 A.2d 1348 (1998). Moreover, the jury was aware that Young had used the document to refresh his recollection prior to his testimony. Therefore, we cannot conclude that it was improper.

to the defendant's home at the time of the search. Therefore, these comments were improper.

Defense counsel also had pointed out in his closing argument that clothing that had been seized from the defendant's apartment—a pair of black pants and a white shirt[23]—had not tested positive for the presence of gasoline. The state's attorney responded to these remarks by speculating that the reason for that fact could be that the defendant had destroyed the clothes.[24] This speculation was improper because it suggests a course of conduct by the defendant indicating consciousness of guilt, for which there was no evidence.

A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. See *State* v. *Copas*, 252 Conn. 318, 336–39, 746 A.2d 761 (2000) (jury's inferences from evidence must be reasonable and founded upon evidence and cannot be based on mere conjecture); *State* v. *Pouncey*, 241 Conn. 802, 811, 699 A.2d 901 (1997) (counsel may not suggest inference from facts not in evidence). Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury. *United States* v. *Modica*, supra, 663 F.2d 1178–79; see also *United States* v. *Salameh*, 152

---

[23] Gansen had described the man he saw crossing the street by the Prince Restaurant as wearing a white shirt and a pair of black pants.

[24] The state's attorney remarked regarding the clothes seized from the defendant's apartment: "The defendant wants you to say because we didn't find gasoline on that particular pair of pants and that particular shirt and we didn't find the sandals that that means he didn't have gas on them. But you see, they are generic. We don't know that . . . there were a whole bunch of pants and shirts, white shirts, black pants in the closet. *We don't know that the ones he was wearing still exist in this world. We don't know whether they are in the dumpster out back, we don't know these things.* You can't say there's evidence that those are his pants because there's no evidence, so what you have is something neutral." (Emphasis added.)

F.3d 88, 133 (2d Cir. 1998), cert. denied, 526 U.S. 1028, 119 S. Ct. 1273, 143 L. Ed. 2d 368 (1999) (noting that "prosecutor has a special duty not to mislead"). Because the state's attorney in the present case asked the jury to engage in speculation, his comments were improper.

## IV

The final category of alleged misconduct is the state's attorney's appeal to the passions, emotions and prejudices of the jury. Specifically, the defendant claims that the state's attorney improperly appealed to the jury's sense of duty to the firefighters and improperly attempted to arouse hostility toward the defendant.

A prosecutor may not appeal to the emotions, passions and prejudices of the jurors. *State* v. *Alexander*, supra, 254 Conn. 307; A.B.A., supra, standard 3-5.8 (c), p. 106. "When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) *State* v. *Brown*, supra, 256 Conn. 307. Therefore, "a prosecutor may argue the state's case forcefully, [but] such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." *State* v. *Bova*, 240 Conn. 210, 243, 690 A.2d 1370 (1997).

In the present case, the state's attorney's comments addressed the danger faced by the firefighters at the fire scene.[25] These comments are similar to ones that

---

[25] The state's attorney commented as follows regarding the fire scene: "This is not a ho-hum situation. This is a dangerous, dangerous situation and, as [Lieutenant Thomas Neville] told you, particularly in a situation where you have an accelerant fire. . . . [J]ust imagine going into a building where you have never been before with zero visibility. Remember . . . [Lieutenant Neville said] that the smoke in there is so thick you can't see at all, groping your way along the walls in order not to kill yourself, tripping over things, falling into holes that may have been caused by the fire, so we

we have previously determined are proper. See *State v. Brown*, supra, 256 Conn. 308–309. We have permitted this type of comment when it has referred to facts in evidence about the danger testified to by the firefighters and was "highlighted . . . as proof of the necessary element of the other first degree arson charge the defendant faced, namely, that the fire subjected the firefighters to a substantial risk of bodily injury." Id.; cf. *State v. Williams*, supra, 41 Conn. App. 187–88 (remarks regarding danger to police improper because no evidence to support fact and irrelevant to matter before jury). The comments in the present case were supported by the firefighters' testimony about the fire conditions and the dangers that they posed. Moreover, we note that one of the comments about which the defendant complains was made by his own counsel.

With respect to the second claim of impropriety, the defendant contends that the state's attorney's comments were "designed to arouse hostility, if not toward Indians, then at least to restaurant owners who owed money." It was the defendant, however, who introduced the issue of ethnicity in an attempt to counter any prejudice that the jury might feel toward an Asian-Indian. Defense counsel argued that "[the defendant] as he sits here is a citizen of this country, he is our brother, our father and our son, and the standard of reasonable doubt that has to be put upon you is if [he] were your brother, your father, your son . . . ." The state's attorney responded that the defendant was not the jurors' father, brother or son, because, unlike the jurors' relatives, the defendant was a person in debt who had been seen by an uninterested witness leaving the vicinity of

are dealing with a very, very serious crime, despite the fact that the fire department did such a good job that they stopped the fire before it took out this whole building."

the fire scene.[26] On the present facts, we conclude that it was not improper for the state's attorney to use the same rhetorical device employed by defense counsel to underscore its theory of the case that the defendant was motivated to commit arson to get out of debt.

We do agree, however, that some of the state's attorney's comments improperly appealed to the emotions of the jury. Specifically, the state's attorney conveyed his personal view of the defendant and expressed his expectations as to the conclusions the jury should reach from the evidence.[27] He underscored the jury's duty to

[26] The state's attorney commented: "The other thing is, this wouldn't be your father and your brother and son on trial here, because they are not the owners of the restaurant, and they are not the people who are deeply in debt, and they are not the people who were seen out there by completely disinterested witnesses, who apparently you have to assume is going to come in here and lie about whether he recognized someone because that is what you have to do to buy the argument that you just heard." The state's attorney later reiterated these comments: "But he's not your brother, he's the owner of the restaurant that burned down; and he's not your father, he's the guy who owes tons of money."

[27] The state's attorney remarked as follows regarding the conclusions that could be drawn from the evidence: "Of course you recognize we are dealing with a very serious situation here with serious crimes, which I submit to you, eventually, ultimately, you will determine were committed by this defendant. Now, there might be some tendency for some people, *although I don't think anyone here*, to say, 'Hey, no one got hurt, the building wasn't all that badly damaged, smudge damage, a room was completely destroyed,' but the reason *I don't think you're going to do that* is not only because it is clear this is not a trivial situation, but also primarily because you heard from Lieutenant [Thomas] Neville, in particular . . . arson is a really dangerous crime." (Emphasis added.)

The state's attorney remarked further: "*The other thing that I thought was really interesting was [the defendant] acted innocent the whole time and he did let them—give them consent to search his apartment . . . but I submit to you that that shows the same kind of arrogance that you saw here, [the defendant] sitting up there telling you I swear to God.*" (Emphasis added.)

The latter comment is improper because it is a personal attack on the defendant that is unsupported by the evidence; cf. *United States* v. *Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997) (no prohibition on remarks even if " 'colorful and perhaps flamboyant' " if they relate to evidence adduced at trial); *State* v. *Bova*, supra, 240 Conn. 243 (caustic description of defendant

the prosecution by stating at the end of his closing that, if the jury could not draw the necessary inferences from the evidence presented, "then you're not the jurors I thought I selected when I started all of this."

The prosecutor's office carries a special prestige in the eyes of the jury. See *United States* v. *Young*, 470 U.S. 1, 18–19, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) ("prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence"); *State* v. *Alexander*, supra, 254 Conn. 302 (recognizing that "[b]y reason of his office, [the prosecutor] usually exercises great influence upon jurors"). Consequently, "[i]t is obligatory for prosecutors to find careful ways of inviting jurors to consider drawing argued inferences and conclusions and yet to avoid giving the impression that they are conveying their personal views to the jurors." (Internal quotation marks omitted.) *United States* v. *Eltayib*, 88 F.3d 157, 173 (2d Cir.), cert. denied, 519 U.S. 1045, 117 S. Ct. 619, 136 L. Ed. 2d 543 (1996); accord *United States* v. *Torres*, 809 F.2d 429, 447 (7th Cir. 1987) (Flaum, J., concurring) ("it is improper for a prosecutor to personalize his or her arguments"). An appeal to the jury to decide the case out of a sense of duty to the state or the prosecutor diverts the jury from its true mission: to decide whether the state has proven beyond a reasonable doubt that the defendant committed a crime. See *United States* v. *Manning*, 23 F.3d 570, 573 (1st Cir. 1994) (arguments that law and justice compel conviction amount to "improper appeals to the jury to act in ways other than as a dispassionate arbiter of the facts"); *United States* v.

as "husband of the week" and "father of the year" unnecessarily caustic but not unsupported by evidence in record); and because it implicitly conveys the state's attorney's opinion regarding the defendant's guilt. See *State* v. *Whipper*, supra, 258 Conn. 270 ("[i]t is axiomatic that it is improper for a prosecutor to express his opinion, directly or indirectly, as to the guilt of the defendant").

*Mandelbaum*, 803 F.2d 42, 44 (1st Cir. 1986) (suggestion that jury has duty to decide case one way or another "is designed to stir passion and can only distract a jury from its actual duty: impartiality"); see also *State* v. *Pouncey*, supra, 241 Conn. 811 (prosecutor should avoid argument that " 'would have the effect of diverting the jury's attention from their duty to decide the case on the evidence' "). Because the remarks in the present case implied that the jury's obligation was to the state's attorney and not solely to make an unbiased determination whether the evidence indeed established the defendant's guilt beyond a reasonable doubt, they were improper.

V

The ultimate question is, in light of the conduct that we have concluded was improper, whether the "trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Alexander*, supra, 254 Conn. 303. This final determination requires, as we have stated previously, the consideration of several factors: the extent to which the misconduct was invited by defense conduct or argument, the severity of the misconduct, the frequency of the misconduct, the centrality of the misconduct to the critical issues in the case, the strength of the curative measures adopted and the strength of the state's case. See *State* v. *Whipper*, supra, 258 Conn. 262–63. We conclude that the defendant was deprived of a fair trial.

Although many of the improprieties were not serious, and referred to secondary or collateral issues, there were four notable exceptions: (1) the questions and comments about witnesses' veracity, in particular, the statements in closing argument that, in order to believe the defendant, the jury would have to conclude that

Gansen had lied; (2) the remark that Pettola and Dellamura may have pumped gasoline while wearing the same shoes they wore at the defendant's apartment; (3) the remarks suggesting that the defendant may have destroyed the clothing that he had worn the night of the fire; and (4) the state's attorney's final remarks suggesting that the jury's duty of loyalty lay with the prosecution.

The prejudicial effect of these comments results from two factors. First, the state's evidence, while sufficient to result in a conviction, was not particularly strong. Indeed, the state's motive evidence was particularly weak—the defendant did not stand to gain in any material way from the fire, with the possible exception of being released from his lease due to the fire clause. More important, there were only two pieces of evidence to connect the defendant to the crime: Gansen's identification of the defendant, which was, in several respects, inconsistent with the description of the person he had given to the police on the night of the fire; see footnote 19 of this opinion; and the defendant's shoes containing traces of a type of gasoline that could not be traced directly to the fire. See footnote 9 of this opinion.

The second, and related, factor indicating the prejudicial effect of the state's attorney's misconduct was that all of the improprieties were connected directly to the critical issue, indeed the only disputed issue at trial—namely, the identity of the arsonist. See *State* v. *Alexander*, supra, 254 Conn. 308 (concluding that prejudice resulted when improper comments addressed critical issue of credibility of victim and state's case was not particularly strong). It is noteworthy that the improper comments regarding this evidence were made both during cross-examination and in closing arguments. Compare *United States* v. *Weiss*, supra, 930 F.2d 195 (finding conduct nonprejudicial when subject of improper cross-examination not highlighted by calling rebuttal witness

or emphasizing in closing argument) with *State* v. *Alexander*, supra, 308 (finding misconduct "pervasive" when comments made both in initial summation and on subsequent rebuttal argument). In the absence of any independent evidence to corroborate the identity of the defendant as the arsonist, we cannot conclude that, had the jury not been exposed to these improper remarks, it would have concluded that the evidence proved beyond a reasonable doubt that the defendant had committed the arson. Accordingly, the defendant was deprived of a fair trial.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case for a new trial.

In this opinion SULLIVAN, C. J., and NORCOTT and ZARELLA, Js., concurred.

BORDEN, J., concurring and dissenting. I agree with the result reached by the majority, and with most of its analysis. I write separately, however, to register my disagreement with some of its reasoning.

With respect to part I of the majority opinion, I agree that the state's attorney improperly emphasized the notion that, in order to acquit the defendant, Balbir Singh, the jury would have to conclude that the witness, Christopher Gansen, was lying in his identification of the defendant. I disagree with the majority's conclusion, however, that the state's attorney improperly expressed his personal belief that the jury had concluded that Gansen had not lied. Simply because the state's attorney used the phrase "I think," is not, in my view, sufficient to invoke the rule that the state's attorney may not express his personal belief in the veracity of a witness. The rationale behind that rule is to prevent the jury from speculating that the state's attorney is presenting his own unsworn testimony and that, because he pre-

pared and presented the case, he may have access to matters not in evidence. *State* v. *Whipper*, 258 Conn. 229, 263, 780 A.2d 53 (2001). In my view, the state's attorney's argument in this respect did not create a serious risk of such speculation.

For the same reason, I disagree with part II of the majority opinion. I do not think that any of the state's attorney's arguments went beyond permissible rhetoric. First, in my view, the majority too easily dismisses the state's attorney's initial caveat to the jury that, when he would be discussing the evidence and how it fits together, he would be doing so as if he had said, " 'I submit to you that you will conclude from the evidence that something happened,' " and that it would be the jury's task, and not his, to see how the evidence fits together and find the facts. The full text of that initial statement to the jury; see footnote 21 of the majority opinion; seems to me to be quite full and fair, and there is no reason to think that the jury did not understand and follow it.

Second, as both the majority and I agree, the rationale for the rule against the state's attorney's expression of his own beliefs is to prevent a form of unsworn testimony that will appear to the jury to be drawn from matters not in evidence to which only the state's attorney had access. *State* v. *Whipper*, supra, 258 Conn. 263. Although the state's attorney used phases such as "I think," and "I believe," rather than "I submit that the evidence shows," I do not believe that his remarks violated that rule. Particularly given his original caveat to the jury, I do not think it is reasonably likely that the jury would have interpreted his remarks as such unsworn testimony.

Thus, in my view, the majority goes too far, and does not give the jury the credit of being able to differentiate between argument on the evidence and attempts to

persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The state's attorney should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he is simply saying "I submit to you that this is what the evidence shows," or the like. I think that the majority creates this impression, and in my view micromanages the limits of prosecutorial argument.

With respect to part IV of the majority opinion, I disagree with the majority's assertion that the state's attorney's reference to the defendant's conduct and demeanor on the stand constituted a personal attack on him. See footnote 27 of the majority opinion. Contending that the jury should reject an inference of innocence arguably deriving from his consent to the search of his apartment was not improper, and did not constitute a personal attack. Furthermore, characterizing him as "arrogan[t]," although perhaps somewhat personal, seems to me to be quite mild as such and within the permissible leeway granted to the vagaries of what often are unprepared oral remarks in final argument.

Nonetheless, despite these disagreements with certain specifics of the majority's reasoning, I agree with its ultimate conclusion that, based on the particular improprieties that it has identified and with which I agree, the state's overall conduct deprived the defendant of a fair trial. I write separately here only to highlight my reasons, which track those of the majority, for that conclusion.

With respect to the only disputed issue in the case, namely, the identification of the defendant as the arsonist, the state's case was weak. It was based solely on Gansen's identification made from across the street at nighttime, and on the presence of gasoline on the shoes

of the defendant, a taxicab driver, who claimed that he had spilled gasoline on his shoes.

Moreover, it was particularly egregious to suggest, both during the trial and in final argument, that in order to acquit the defendant, the jury would necessarily have to believe that it was the defendant's testimony that Gansen was lying in his eyewitness identification of the defendant and that the police officers were lying in their testimony regarding whether a state police canine had alerted to the defendant's shoes. It is too close a step from this argument to the equally improper argument, which the jury was likely to have heard, that in order to acquit the defendant the jury would have had to find that these witnesses had lied. It is obvious that there are many explanations for a claimed misidentification other than a lie, and there was no evidence that the defendant knew that the canine had alerted to his shoes.

It was also egregious, in my view, to imply that the jurors had some sort of obligation to the state—to be, in the words of the state's attorney, "the jurors [he] thought [he] selected when [he] started all of this." The expression of this sense of either obligation to him or expectation by him created too high a risk of impermissibly skewing the jurors' views of their proper function as impartial fact finders, without alignment with either side.

Finally, the suggestion by the state, during final argument, that the defendant had destroyed his shirt—had disposed of it in the dumpster—also was unjustified by any evidence. Its necessary implication of consciousness of guilt could not have gone unnoticed by any discerning juror.

This is one of the rare cases in which the totality of the improprieties leads to the conclusion that the defendant was deprived of a fair trial. I therefore agree with the majority that the conviction must be reversed.