# STATE OF CONNECTICUT *v.* GARY S.*
## (SC 20438)

McDonald, D'Auria, Mullins, Ecker,
Alexander and Keller, Js.

*Syllabus*

Pursuant to statute (§ 53a-71 (a) (4)), "[a] person is guilty of sexual assault
in the second degree when such person engages in sexual intercourse
with another person and . . . such other person is less than eighteen
years old and the actor is such person's guardian or otherwise responsi-
ble for the general supervision of such person's welfare . . . ."

Convicted of numerous crimes, including sexual assault in the second degree
and risk of injury to a child, in connection with the sexual abuse of S
and A, the defendant appealed to this court. S is the biological daughter
of the defendant and his former spouse, D, and A is D's granddaughter,
whom D was raising. The defendant allegedly began to abuse S when
she was twelve years old, after the defendant married D for the first
time. At that point, the defendant was living with D, S, and A, and caring
for S and A while D was at work. Over the course of approximately
four years, the defendant forced S to have vaginal and oral intercourse
with him numerous times. On some of those occasions, the defendant
told S that her "pussy was his" and that she "better not give it up
to anybody." On one occasion, S successfully resisted the defendant's
advances, leading him to say, "fuck you, bitch." Following these inci-
dents, the defendant often would threaten to kill S and D, if S told
anyone what had happened. One or two years after the defendant last
had vaginal intercourse with S, he attempted to force A, who was six
or seven years old, to perform oral sex on him. A was able to resist
those efforts, but the defendant proceeded to digitally penetrate A's
vagina. At some point during this period, D separated from, and eventu-
ally divorced, the defendant due to his domestic abuse toward her.
The defendant and D later remarried but separated again due to the
defendant's continued abuse. Several years later, S disclosed to T, D's

---

* In accordance with our policy of protecting the privacy interests of the
victims of sexual abuse and the crime of risk of injury to a child, we decline
to use the defendant's full name or to identify the victims or others through
whom the victims' identities may be ascertained. See General Statutes
§ 54-86e.

State *v.* Gary S.

daughter from a prior relationship, that the defendant had sexually
assaulted her. T then told S that she also had been sexually assaulted
by the defendant. Upon hearing of T's and S's disclosures, A made her
own disclosure. The state subsequently charged the defendant in an
eight count information with various crimes, including, in count three,
risk of injury to a child for allegedly subjecting A to contact with the
defendant's intimate parts, and, in counts five, six, and seven, sexual
assault in the second degree in violation of § 53a-71 (a) (4) for his
assaults on S on "uncertain dates" during a specified four year period
of time, while he purportedly was responsible for the general supervision
of S's welfare. At trial, there was conflicting testimony as to where the
defendant was living when those sexual assaults took place. Specifically,
certain dates D provided at trial with respect to when she and the
defendant separated and whether they had resumed living together con-
tradicted certain dates provided by S and A during their respective
testimonies. D had testified, however, that her memory with respect to
dates was adversely affected by her tendency to block out trauma.
During closing argument, the prosecutor highlighted the "vulgar" and
"disgusting" remarks that the defendant made to S and remarked that
D could not explain why she remarried the defendant because she
was exposed to trauma and was a victim of domestic violence. On the
defendant's appeal from the judgment of conviction, *held*:

1. Although the evidence was sufficient to support the defendant's conviction
   of the counts of sexual assault in the second degree pertaining to S,
   the evidence was insufficient to support his conviction of risk of injury
   to a child pertaining to A:

   a. A testified that she successfully resisted the defendant's efforts to
   force her to perform oral sex on him, the state conceded that there was
   no evidence presented at trial that A had contact with the defendant's
   intimate parts, which was required under the portion of the risk of injury
   statute (§ 53-21 (a) (2)) under which the defendant had been charged
   in connection with his conduct toward A, and, accordingly, this court
   accepted the state's concession that there was insufficient evidence to
   support the defendant's conviction of risk of injury to a child pertaining
   to A, reversed the defendant's conviction as to that charge, and remanded
   the case with direction to render a judgment of acquittal as to count
   three of the information.

   b. The evidence presented at trial was sufficient to support the defen-
   dant's conviction of the three counts of sexual assault in the second
   degree pertaining to S, as the jury reasonably could have concluded that
   the defendant was S's guardian or otherwise responsible for the general
   supervision of her welfare at the time of the charged sexual misconduct:

   Contrary to the defendant's claim that he was acting as a mere babysitter
   to S during the relevant time period, when the sexual assaults took

State *v.* Gary S.

place, the jury reasonably could have concluded that the defendant was exercising sufficient authority and control over S such that he was responsible for her general supervision for purposes of § 53a-71 (a) (4) at the time of the assaults, especially in light of the fact that the defendant is S's biological father and S's testimony that the defendant assaulted her on numerous occasions while he lived in the same residence as her and that the incidents of abuse occurred when D was working and when the defendant was the only adult in the home.

Moreover, although S's and D's testimony conflicted as to whether the defendant was residing with them when the assaults occurred, the jury was free to resolve any inconsistencies by crediting S and A's combined testimony over the admittedly dubious recollection of D, who testified that she had a difficult time recalling dates due to past trauma.

2. The defendant could not prevail on his claim that the prosecutor had committed certain improprieties during closing and rebuttal arguments, in violation of the defendant's due process right to a fair trial:

a. The prosecutor did not improperly appeal to the jurors' emotions by emphasizing certain "vulgar" and "disgusting" comments that the defendant had made while he sexually assaulted S, as the challenged remarks were based on the evidence presented at trial, were relevant to the charges, and supported the state's theory that S delayed in her disclosure of the sexual abuse because she was afraid of the defendant:

The prosecutor's remark that the defendant got so angry and frustrated with S that he said, "fuck you, bitch," was relevant to the charge of attempt to commit sexual assault with respect to S because it illustrated that the defendant had the intent to sexually assault S and became so frustrated when he was unsuccessful that he addressed his own daughter using vulgar language.

The prosecutor's reference to the defendant's comments, made while he was having intercourse with S, regarding S's "pussy" having belonged to him, was relevant to the charge of sexual assault in the second degree because it illustrated that the defendant and S engaged in sexual intercourse and was also relevant to the charge of risk of injury to a child because it illustrated that the defendant caused S to have contact with his intimate parts in a sexual and indecent manner that was likely to impair her morals, and those comments also supported the state's theory that S delayed in her disclosure of the sexual abuse because of her fear of the defendant and the embarrassing nature of the incidents.

The prosecutor's characterization of the defendant's comments as "vulgar" and "disgusting," and his remark that "[t]his is how he talks to a twelve year old, his own biological daughter," did not amount to an impermissible personal attack on the defendant, as that commentary

State *v.* Gary S.

was based on S's testimony and was not so gratuitous, crudely phrased, or inflammatory as to rise to the level of an improper personal attack.

b. Although not all of the prosecutor's challenged remarks constituted unsworn testimony or improperly vouched for the credibility of the state's witnesses, as the defendant claimed, certain remarks the prosecutor made regarding the defendant's domestic abuse of D were improper:

The prosecutor's remark, regarding the disclosures made by T, S, and A, that "[t]his isn't a case of [the three girls] get[ting] together and get[ting] [their] stories straight" did not constitute unsworn testimony or improperly vouch for the credibility of the state's witnesses, as it was based on evidence presented at trial, namely, the testimony of T, S, and A regarding how their disclosures occurred and the lack of any evidence that they had conversations to conspire against the defendant prior to their disclosures, the jury reasonably could have inferred from that evidence that the girls had not coordinated their accusations out of some conspiratorial vengeance, and there was no merit to the defendant's contention that the prosecutor improperly relied on constancy of accusation evidence in making the challenged remark.

The prosecutor's remark that S had a "flat affect" while testifying did not improperly usurp the jury's role in judging S's credibility but, instead, served to urge the jury to draw a reasonable inference from the evidence presented at trial, including S's testimonial demeanor and certain expert testimony on the effects of trauma, that S's demeanor was consistent with the demeanor of individuals who have experienced trauma, and this court found unavailing the defendant's argument that such an inference involved a matter requiring the jury to have special expertise, akin to that of making a psychiatric diagnosis.

The prosecutor's remarks regarding how D could not explain why she remarried the defendant because she was exposed to trauma and was a victim of domestic violence were improper because they violated a limiting instruction that the trial court had given to the jury that evidence of the defendant's abuse of D was to be used only for the purpose of explaining why S and A had delayed in their disclosures of the sexual abuse, and evidence that properly was admitted at trial could not be used for a purpose for which it was not admitted.

c. The prosecutor's improper remarks regarding the domestic abuse of D did not deprive the defendant of his right to a fair trial, as the jury's verdict would not have been different in the absence of the prosecutor's improper remarks:

The improper remarks were not frequent or severe, defense counsel did not object to the remarks, and they were counterbalanced by the trial court's instructions following closing arguments that evidence of the

State *v.* Gary S.

defendant's abuse of D could be used only to explain why S and A had delayed in their disclosures of the sexual abuse.

Moreover, although the credibility of the witnesses was a central issue in the case and the remarks had some bearing on credibility, the defense, at least in part, invited the remarks, and the state's case, which included the testimony of T, S, and A, all of whom had experienced the defendant's sexual abuse, was not overshadowed by those improper remarks as to D, especially in view of the trial court's jury instructions.

Argued September 12—officially released December 6, 2022

*Procedural History*

Substitute information charging the defendant with three counts of the crime of sexual assault in the second degree, two counts each of the crimes of attempt to commit sexual assault in the first degree and risk of injury to a child, and one count of the crime of sexual assault in the first degree, brought to the Superior Court in the judicial district of Middlesex and tried to the jury before *Suarez, J.*; verdict and judgment of guilty, from which the defendant appealed. *Reversed in part*; *judgment directed.*

*John R. Weikart*, assigned counsel, with whom was *Emily Graner Sexton*, assigned counsel, for the appellant (defendant).

*Thadius L. Bochain*, assistant state's attorney, with whom were *Russell Zentner*, senior assistant state's attorney, and, on the brief, *Michael A. Gailor*, state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Gary S., appeals[1] from the judgment of conviction, rendered after a jury trial, of two counts of attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70 (a) (2), one count of sexual assault in the first degree in violation of General Statutes § 53a-

---

[1] The defendant appealed directly to this court pursuant to § 51-199 (b) (3).

State *v.* Gary S.

70 (a) (2), three counts of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (4), and two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2). On appeal, the defendant claims that (1) the evidence was insufficient to support his conviction on certain counts, and (2) the prosecutor made improper remarks during closing and rebuttal arguments that deprived the defendant of his constitutional right to a fair trial. Because the state concedes that the evidence presented at trial was insufficient to support the defendant's conviction on the charge of risk of injury to a child pertaining to one of the complainants, A, we reverse the trial court's judgment with respect to that count. We reject each of the defendant's remaining claims and, accordingly, affirm the judgment of conviction in all other respects.

The jury reasonably could have found the following facts on the basis of the evidence presented at trial. In 1990, the defendant and his girlfriend, D, had a daughter, S. At that time, D also had two children from a previous relationship, a daughter, T, and a son, C. For most of that decade, the defendant, D, S, and C lived together in a three bedroom home located in Middletown. Although T resided with her grandmother, she would occasionally come to visit overnight. In 1993, D started working the "third shift" as a certified nurse assistant. As a result, the defendant was normally the only adult in the home from 11 p.m. to 7 a.m.

Evidence adduced during the course of the trial suggested that, between 1994 and 1996, the defendant sexually assaulted T more than ten times. T testified at trial that, during her overnight visits at the Middletown residence, the defendant would sometimes take her to the master bedroom, engage in vaginal intercourse with her, and then direct her not to tell anyone about it. At

State *v.* Gary S.

that time, T was between the ages of eleven and thirteen years old.[2]

Subsequently, the defendant married D for the first time when S was approximately ten years old.[3] In 2001, C fathered his own daughter, A. C moved out of the Middletown residence shortly thereafter, leaving A to be raised by D. D testified at trial that, around this same time, she was working between forty and eighty hours per week at a hospital and left the defendant home alone with S and A.

In the summer of 2002, when S was twelve years old, the defendant forced her to have vaginal intercourse with him while they were alone in the basement of the Middletown residence. As he was having intercourse with her, the defendant said that her vagina was "his pussy" and that she "better not give it up to anybody." On another occasion that summer, the defendant attempted to have vaginal intercourse with S while A, then an infant, was present, but S was able to resist, leading the defendant to respond, "fuck you, bitch."[4]

Between the summer of 2002 and the end of December, 2006, the defendant forced S to have vaginal intercourse with him more than twenty times and to perform oral sex on him more than ten times, and he performed cunnilingus on S more than ten times. The last time

---

[2] The state did not ultimately bring any charges against the defendant related to his alleged sexual assault of T because the relevant statute of limitations had expired. The trial court admitted testimony from T about these assaults solely as evidence of the defendant's prior uncharged misconduct. See, e.g., *State* v. *DeJesus*, 288 Conn. 418, 463, 953 A.2d 45 (2008).

[3] As previously indicated, S was born in 1990.

[4] This incident of attempted sexual intercourse with S is the first incident relevant to the charges brought by the state against the defendant in connection with the defendant's assaults on S. In count four of the operative information, the state alleged that, "on an uncertain date in the summer of 2002," the defendant attempted to commit sexual assault, in violation of §§ 53a-49 (a) (2) and 53a-70 (a) (2). The state's eight count information will be discussed subsequently in this opinion.

State *v.* Gary S.

the defendant had vaginal intercourse with S was in December, 2006, when she was sixteen years old. Each time the defendant sexually assaulted S during this period, no other adults were present in the house. The defendant usually would assault S inside the master bedroom with the door locked. Following these incidents of sexual abuse, the defendant often would threaten to kill S and D, if S told anyone what had happened. S took these threats seriously and feared the defendant. In addition, on numerous occasions when the defendant had vaginal intercourse with S during this period, he would continue to tell her that her "pussy was his" and that she "better not be giv[ing] it to anybody . . . ."

In 2007 or 2008, when A was six or seven years old, the defendant entered the master bedroom, which he shared with D, where A was watching television. The defendant then proceeded to pull his penis out of his pajama pants and attempted to force A to perform oral sex on him "by putting his hand on the back of [her] head . . . ." At trial, A testified that she "moved it," "kept saying no," and was ultimately able to resist his efforts. The defendant then undressed A and digitally penetrated her vagina. A testified that the defendant stopped only after he heard a knock at the front door of the residence. The defendant told A that he would kill her if she told anyone about what had happened. The defendant was the only adult at home during this incident, and this was the only time that the defendant sexually assaulted A. A testified that, when she was growing up, the defendant supervised her "[a]ll the time" while D was at work and that he played the role of a father. A also testified that the defendant was residing in the home when this particular assault against her took place.

D separated from, and eventually divorced, the defendant after separate incidents of domestic abuse.[5] D later

_____

[5] S often witnessed the defendant abusing D. As we discuss subsequently

State *v.* Gary S.

remarried the defendant in "secret" because he needed to obtain health insurance. When asked why she remarried the defendant despite the abuse, D testified that she could not explain why. During the second marriage, the defendant was still abusive, and the pair separated once again in 2011 or 2012.[6]

For years, S and A did not report what the defendant had done to them to anyone out of fear that he would harm them.[7] S also did not disclose the incidents to D because she thought D would not believe her. S indicated that D would always put men first before her own children. In March, 2017, S called T and revealed to her for the first time that the defendant had sexually assaulted her. T, in turn, told S that she also had been sexually assaulted by the defendant.

A few days after the conversation between S and T, T disclosed to D that the defendant had assaulted both her and S.[8] A was present at the time and told D and T that the defendant had also assaulted her in 2007 or 2008. This was the first time that A had told anyone about what the defendant had done to her. D then called the Middletown Police Department, which commenced a criminal investigation. Detective Derek Puorro obtained

in this opinion, evidence related to these incidents was admitted at trial for the limited purpose of explaining S's and A's delay in reporting the defendant's sexual assaults.

[6] The testimony at trial from S, D, and A conflicted as to the precise date on which the defendant was no longer residing in the Middletown residence. D's and A's testimony also conflicted as to the date when D and the defendant subsequently remarried. The testimony addressing these topics will be discussed in part I B of this opinion.

[7] At trial, S testified that she previously had disclosed the sexual abuse to a friend, E, and to C, but there was no evidence indicating that either of them had ever reported the information. At trial, E testified as to the disclosures of sexual abuse that S had made to her.

[8] T previously disclosed to D that she had been sexually assaulted by the defendant before D remarried him. D did not contact the authorities at that time because she was "afraid" of the repercussions she would face from the defendant.

State *v.* Gary S.

statements from S, A, T, and D. S, A, and T were each
interviewed separately by Puorro. No forensic evidence
of the sexual assaults was obtained because of the amount
of time that had passed between the assaults and dis-
closure.

Following his arrest, the state charged the defendant,
in a third substitute information, with eight counts.
Counts one through three pertain to the defendant's
assault on A, while counts four through eight pertain
to the defendant's assaults on S. As to the assaults on
A, the state charged that, "on an uncertain date between
December 31, 2007, and December 31, 2009," the defen-
dant attempted to commit sexual assault in the first
degree, namely, attempted fellatio, in violation of
§§ 53a-49 (a) (2) and 53a-70 (a) (2) (count one); sexual
assault in the first degree, namely, digital vaginal pene-
tration, in violation of § 53a-70 (a) (2) (count two); and
risk of injury to a child, namely, subjecting A to contact
with the defendant's intimate parts, in violation of § 53-
21 (a) (2) (count three).

As to S, the state charged the defendant with one
count of attempt to commit sexual assault in the first
degree in violation of §§ 53a-49 (a) (2) and 53a-70 (a) (2),
alleging attempted vaginal intercourse on "an uncertain
date in the summer of 2002" (count four); three counts
of sexual assault in the second degree in violation of
§ 53a-71 (a) (4), alleging vaginal intercourse (count
five), fellatio (count six), and cunnilingus (count seven)
on "uncertain dates between March 30, 2003, and
December 31, 2006"; and one count of risk of injury to
a child in violation of § 53-21 (a) (2), alleging that the
defendant had caused S to come in contact with his
intimate parts on "uncertain dates between March 30,
2003, and December 31, 2006" (count eight).

After the state rested its case, the defendant moved
for a judgment of acquittal as to all eight counts of the

State *v.* Gary S.

state's information, arguing that the evidence presented was insufficient to support a conviction. The trial court denied the motion, and the defense rested its case without presenting any evidence. The jury found the defendant guilty on all eight counts. The defendant then filed a motion for a judgment of acquittal as to counts five, six, and seven on the basis that the state had failed to establish that the defendant was S's "guardian" or "otherwise responsible for the general supervision of [S's] welfare" between the period of March 30, 2003, and December 31, 2006. (Internal quotation marks omitted.) The trial court denied the motion, concluding that "the jury could reasonably infer that, at the time of the alleged sexual assault, the defendant was [S's] guardian and/or responsible for her general supervision." The trial court sentenced the defendant to a term of thirty years of imprisonment, with five years of special parole.[9] This direct appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the evidence was insufficient to support his conviction of risk of injury to a child relating to A and his convictions of sexual assault in the second degree relating to S. For the reasons that follow, we accept the state's concession that the evidence was insufficient to support the defendant's conviction of risk of injury to a child pertaining to A, as charged in count three of the state's information, but we conclude that the state's evidence was sufficient to support the defendant's convictions of sexual assault

---

[9] For the crimes against A alleged in counts one, two and three, the trial court imposed three concurrent sentences of fifteen years of imprisonment and five years of special parole, with special conditions. For the crimes against S alleged in counts four, five, six, seven, and eight, the trial court imposed four sentences of fifteen years of imprisonment, to be served concurrently with one another but consecutively to the sentences imposed on counts one, two, and three.

State *v.* Gary S.

in the second degree pertaining to S, as charged in counts five, six, and seven of the information.

The standard of review applicable to both of these claims is well established. "When reviewing a sufficiency of the evidence claim, we do not attempt to weigh the credibility of the evidence offered at trial, nor do we purport to substitute our judgment for that of the jury. . . . [W]e construe the evidence in the light most favorable to sustaining the verdict. . . . We then determine whether the jury reasonably could have concluded that the evidence established the defendant's guilt beyond a reasonable doubt. . . . [W]e do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty. . . . When a claim of insufficient evidence turns on the appropriate interpretation of a statute, our review is plenary." (Citations omitted; internal quotation marks omitted.) *State* v. *Lamantia*, 336 Conn. 747, 755, 250 A.3d 648 (2020). We consider the defendant's claims of insufficiency of the evidence in turn.

A

The defendant first claims that the evidence presented in connection with the charge of risk of injury to a child pertaining to A, in violation of § 53-21 (a) (2),[10] as charged in count three of the state's information,

---

[10] General Statutes § 53-21 (a) (2) provides in relevant part that a person is guilty of risk of injury to a child when that person "has contact with the intimate parts . . . of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . ."

We note that § 53-21 was amended by No. 13-297, § 1, of the 2013 Public Acts and No. 15-205, § 11, of the 2015 Public Acts. Those amendments made certain changes to the statute that are not relevant to this appeal. In the interest of simplicity, we refer to the current revision of the statute.

State *v.* Gary S.

was insufficient to support his conviction because there was no evidence that A had contact with the defendant's "intimate parts." In particular, the defendant argues that, because A testified that, on one occasion, she successfully resisted the defendant's efforts to force her to perform fellatio on him, there was no evidence that she came in contact with the defendant's genital area during that incident. The state concedes that the evidence presented during the trial on this count was insufficient in this regard. Accordingly, we accept the state's concession, reverse the defendant's conviction as to that charge, and remand the case to the trial court with direction to render a judgment of acquittal as to count three.

B

The defendant next claims that the evidence presented in connection with the charges of sexual assault in the second degree, relating to S, in violation of § 53a-71 (a) (4), as charged in counts five, six, and seven of the state's information, was insufficient to support his convictions on those counts. Specifically, he contends that he was not responsible for S's "general supervision," as required under the charged portion of the statute, between the period of March 30, 2003, and December 31, 2006.

The following additional facts are relevant to this claim. At trial, the state called multiple witnesses to testify, including S, D, and A. There was conflicting testimony from S and D as to whether the defendant was living in the Middletown residence when the sexual assaults on S took place between March 30, 2003, and December 31, 2006, the period relevant to counts five, six, and seven of the state's information. On direct examination, after describing the incidents of sexual assault that occurred after the summer of 2002, S indicated that, at some point, the defendant and D sepa-

State *v.* Gary S.

rated, and the defendant moved out of the residence. S testified that, after this separation, the defendant would continue to reside in the residence periodically. She testified that the assaults would stop when the defendant did not live with them but would resume when he moved back in.[11] S also testified that she would stay outside "all day" or go to her grandmother's house to avoid the defendant. On cross-examination, S testified that, although she resided at the Middletown residence until 2017, the defendant only lived there for "some of those years," "[f]rom, like, 1996 to 2006 . . . maybe."

---

[11] The following colloquy occurred between the prosecutor and S during direct examination:

"Q. Did these incidents [of sexual assault] eventually end or stop for you? Did [the defendant] eventually stop doing this? And, if so, why?

"A. It did when he—when he moved out.

"Q. When he moved out?

"A. Yes.

"Q. Were there ever times when he had left the house and then come back?

"A. Yes.

"Q. Okay. And why was that? Why did he leave and then come back, do you know?

"A. Him and mom split apart. Then, they got back together.

"Q. There were times when they would split apart and then they would come back together?

"A. Yes.

"Q. And, when the times that he was out of the house, did any of the incidents happen then?

"A. No.

"Q. When he would move back in, what would happen with regard to these incidents?

"A. It would start up again.

"Q. Okay. And he would . . . do the same things that you mentioned?

"A. Yes.

"Q. Just so the record is clear, he would—he would do vaginal intercourse with you?

"A. Yes.

"Q. And, then, he would perform oral sex on you?

"A. Yes.

"Q. And, then, you would have to do it on him?

"A. Yes."

Subsequently, S testified that the last time the defendant had sexually assaulted her was in the master bedroom around "[t]he end of 2006."

State *v.* Gary S.

D's recollection did not follow the same chronology as S's with respect to the defendant's presence in the household. D testified that she and the defendant separated in 2003 or 2004, and that the defendant was no longer living with them or watching S or A while D was at work. D could not remember when she and the defendant formally divorced after their first marriage but thought that the defendant did not resume living in the Middletown residence until after their remarriage in 2010 or 2011. D testified that she and the defendant then separated for a second time in 2011 or 2012, due to the continued physical and verbal abuse she experienced, and that the defendant again moved out of the residence at that time. D testified, however, that her memory for dates is adversely affected because she "block[s] [traumatic] stuff out" and "[t]hat's how [she] cope[s]." D's testimony also conflicted with the testimony of A, who testified that the defendant was residing in the residence when he sexually assaulted her in 2007 or 2008, until "[m]aybe a few years after," and that the defendant and D remarried before the end of 2007.

The defendant contends that, because the state was unable to prove that he was a permanent fixture in the Middletown residence from the relevant period of March 30, 2003, to December 31, 2006, when it is alleged that he sexually assaulted S, he cannot be held criminally responsible under § 53a-71 (a) (4). The defendant argues that, on the basis of the evidence presented at trial, the jury reasonably could have concluded only that he was acting as a mere "babysitter" to S during the relevant period and that such a person falls outside the class of persons that can be held liable under § 53a-71 (a) (4). We disagree with the defendant's assertion that he was acting as a mere "babysitter" to S.

Section 53a-71 (a)[12] provides in relevant part: "A person is guilty of sexual assault in the second degree

_____

[12] We note that, although § 53a-71 has been amended by the legislature several times since the events underlying the present case; see, e.g., Public

State *v.* Gary S.

when such person engages in sexual intercourse with another person and . . . (4) such other person is less than eighteen years old and the actor is such person's guardian or otherwise responsible for the general supervision of such person's welfare . . . ."[13] In counts five, six, and seven of the information, the state charged that the defendant committed sexual assault in the second degree while he was responsible for S's general supervision.[14]

The defendant argues that his convictions cannot be sustained under our holding in *State* v. *Burney*, 189 Conn. 321, 455 A.2d 1335 (1983). In that case, this court held that "the proximity of the words 'or otherwise responsible for' to the word 'guardian' [in § 53a-71 (a)] indicates that the legislature intended the categories to be roughly equivalent, with the obligations and degree of control of the actor over the child . . . to be similar to those of legal guardianship." Id., 327. The complain-

---

Acts 2013, No. 13-47, § 1; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[13] Section 53a-71 (a) (4) is derived from § 213.3 of the Model Penal Code, which, in turn, was drafted to reach "one kind of illegitimate use of authority to gain sexual gratification" and "illicit intercourse achieved by misuse of a position of authority or control." 2 A.L.I., Model Penal Code and Commentaries (1980) § 213.3, comment 3, p. 387. The official commentary to the Model Penal Code cites the relationship between a stepparent and a stepchild as "a frequent instance of sexual imposition within the family unit," and also emphasizes that "probation officers, camp supervisors, and the like" are individuals who ultimately have responsibility for the general supervision of a child's welfare. Id.

[14] By law, both biological parents of a child are legally the child's guardian, unless removed as such. See, e.g., General Statutes § 45a-606 ("The father and mother of every minor child are joint guardians of the person of the minor, and the powers, rights and duties of the father and the mother in regard to the minor shall be equal. If either father or mother dies or is removed as guardian, the other parent of the minor child shall become the sole guardian of the person of the minor.") However, because the state did not charge the defendant as a guardian under § 53a-71 (a) (4), our analysis and conclusion in this appeal rest solely on whether the defendant was responsible for the general supervision of S during the relevant period.

State *v.* Gary S.

ant in *Burney* had left Hartford with the defendant for a trip to New York. Id., 323. The defendant drove the complainant as far as New Haven, where he obtained a motel room and proceeded to have vaginal intercourse with her. Id. Afterward, the defendant and the complainant returned to the defendant's home in Hartford, where the complainant had been living for one and one-half months. Id. When they returned to the defendant's home, the complainant received a message that her mother wanted her to return home. Id. Once she returned home, the complainant told her mother what had happened, and the two of them went to the police station to file a complaint. Id.

We concluded that the terms "responsible for" and "general supervision," as used in § 53a-71 (a) (4),[15] were ambiguous. (Internal quotation marks omitted.) Id., 325. Relying on traditional principles of statutory construction, we held that, "[although] it is clear that a judicial decree is not necessary in order to become responsible for the general supervision of a minor under [the statute], neither is the mere assumption by a third person of the temporary care of a minor enough to bring that third party within the class of persons to whom the statute applies."[16] Id., 326. In determining that the evidence was insufficient to establish that the defendant was responsible for the complainant's general supervision at the time of the assault, we considered whether the mother had intended to relinquish responsibility for the supervision and control of the complainant to the defendant. Id., 328. Specifically, we observed that "[t]here [was] no evidence that responsibility for the complain-

[15] When this court decided *Burney*, subdivision (4) of § 53a-71 (a) was subdivision (3). In 1983, the legislature renumbered subdivision (3) as subdivision (4). See Public Acts 1983, No. 83-326, §1.

[16] Although there was some evidence to support the conclusion that the defendant in *Burney* was, in fact, the biological father of the complainant, her birth certificate listed another man as the father. See *State* v. *Burney*, supra, 189 Conn. 323–24.

State *v.* Gary S.

ant's welfare had been vested in the defendant by court order or award, nor [was] there any evidence that the . . . mother had intended to relinquish responsibility for the supervision of [the complainant's] welfare to the defendant. Instead, the . . . mother testified that she had placed a call to the defendant's home leaving instructions for [the complainant] to come home.'' Id.

The present case is readily distinguishable from *Burney*, in which this court held that a putative father whose paternity had never been legally established; id., 323–24; has no responsibility for the welfare of his purported child under § 53a-71 (a) (4)[17] unless the child's mother bestows it on him.[18] Id., 328. Here, unlike in *Burney*, it is undisputed that the defendant is S's biological father. In addition, as discussed previously, the jury heard testimony from S that, from the summer of 2002 to the last incident of vaginal intercourse in December, 2006, the defendant sexually assaulted her on numerous occasions. S testified that the defendant resided in the Middletown residence from 1996 to 2006 and that, each time the defendant sexually assaulted her after the summer of 2002, he was residing in the residence. S indicated that the incidents would stop when the defendant moved out but would resume when he moved back in. The jury also heard testimony that these incidents of abuse occurred when D was working and that the defendant was the only adult in the home at the time. On

[17] See footnote 15 of this opinion.

[18] We recognize that this court placed great emphasis on the mother's decision not to transfer supervision of her child to the defendant in *Burney*; see *State* v. *Burney*, supra, 189 Conn. 328; but the mother's intention to relinquish control is not necessarily dispositive. It is only one factor, among a multitude of others, that courts in this state have considered. See, e.g., *State* v. *Richard S.*, 143 Conn. App. 596, 604–605, 70 A.3d 1110 (considering defendant's parent-child relationship with victim in concluding that there was sufficient evidence to find guilt under § 53a-71 (a) (4)), cert. denied, 310 Conn. 912, 76 A.3d 628 (2013). We add here the obvious fact that a biological mother is not solely responsible for the care and supervision of a child, to the exclusion of a biological father. See footnote 14 of this opinion.

State *v.* Gary S.

the basis of this evidence, viewed in a light most favorable to sustaining the verdict, the jury reasonably could have concluded that the defendant, a biological father who resided with and was caring for his own daughter, was exercising sufficient authority and control over S to fall within the ambit of § 53a-71 (a) (4).[19]

Although S's and D's testimony conflicted as to when the defendant was living at the Middletown residence, the jury was free to resolve inconsistencies by crediting S and A's combined testimony over D's admittedly dubious recollection. See *State* v. *Morgan*, 274 Conn. 790, 800, 877 A.2d 739 (2005) ("[i]t is axiomatic that evidentiary inconsistencies are for the jury to resolve, and it is within the province of the jury to believe all or only part of a witness' testimony" (internal quotation marks omitted)). It was especially reasonable for the jury to conclude that S was more credible than D on the issue considering that D testified that she had a difficult time recalling dates due to trauma and that D's testimony also conflicted with the accounts that S and A had provided. D testified that the defendant moved out of the residence in 2003 or 2004, after she and the defendant first separated, but that the defendant did not resume living in the home until their remarriage in 2010 or 2011. S testified that the defendant was residing in the residence whenever he assaulted her after the summer of 2002 to the last incident of abuse at the end of 2006, and A testified that D and the defendant remarried before the end of 2007, and that the defendant was, in fact, residing in the home in 2007 or 2008.

_____

[19] The present case does not require us to reconsider our suggestion in *Burney* that being responsible for the general supervision of a child is equivalent to legal guardianship; see *State* v. *Burney*, supra, 189 Conn. 327; but we do question that gloss in light of the very large number of children placed under the supervision of adults—relatives, foster parents, daycare and other childcare providers, and the like—whose status, although not akin to that of a legal guardian, makes them "responsible for the general supervision of [a child's] welfare" within the meaning of § 53a-71 (a) (4).

State *v.* Gary S.

Accordingly, after reviewing the evidence in a light most favorable to sustaining the jury's verdict and the circumstances surrounding the incidents of abuse that took place between the period of March 30, 2003, and December 31, 2006,[20] we conclude that there was sufficient evidence presented at trial from which the jury reasonably could have concluded that the defendant, a father who was cohabitating with S and was the only adult at home responsible for her care while D was working, was exercising general supervision over S's welfare during the time period relevant to the charges of sexual assault in the second degree, as set forth in counts five, six, and seven of the state's information.[21]

## II

We next address the defendant's claim that the prosecutor made improper remarks during closing and rebut-

---

[20] We likewise reject the defendant's argument that the state must specify the dates when the defendant assaulted S. See *State* v. *Stephen J. R.*, 309 Conn. 586, 601, 72 A.3d 379 (2013) ("[t]o require [a child victim] . . . to recall specific dates or additional distinguishing features of each incident would unfairly favor the defendant for the commission of repetitive crimes against a child victim"). The state has presented sufficient evidence from which a jury could conclude that each time S was sexually assaulted between March 30, 2003, and December 31, 2006, the defendant was an individual responsible for the general supervision of S.

[21] Contrary to the defendant's assertion, this conclusion also does not conflict with our holding in *State* v. *Snook*, 210 Conn. 244, 555 A.2d 390, cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989). In that case, the issue centered on whether the defendant, as a biological parent of the victim, could be subject to prosecution under § 53a-71 (a) (4). Id., 266. We held that biological parents are not exempt from prosecution under subsection (a) (4), as long as they are either the victim's legal guardian or responsible for the general supervision of the victim's welfare. Id., 267–68; see also *State* v. *Richard S.*, 143 Conn. App. 596, 604–605, 70 A.3d 1110 (defendant was responsible for victim's care and general supervision when defendant, as biological parent, provided victim with food, shelter, and transportation, and cultivated parent-child relationship, and victim had been residing with defendant for one month at time of sexual assault), cert. denied, 310 Conn. 912, 76 A.3d 628 (2013). In the present case, we find that the defendant, as S's biological parent, falls within the "general supervision" category under § 53a-71 (a) (4).

State *v.* Gary S.

tal arguments, in violation of the defendant's constitutional right to a fair trial. The defendant argues that (1) certain remarks by the prosecutor improperly appealed to the jurors' passions, emotions, and prejudices, and (2) certain other remarks constituted unsworn testimony and improperly vouched for the credibility of witnesses. Although we agree with the defendant that some of the prosecutor's remarks were improper, after applying the factors in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), we conclude that those improprieties were harmless.

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of a constitutionally protected right. . . . [W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Citation omitted; internal quotation marks omitted.) *State* v. *Courtney G.*, 339 Conn. 328, 340, 260 A.3d 1152 (2021).

"It is well established that prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however, counsel] must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or

State *v.* Gary S.

diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence [on] jurors. . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present matters [that] the jury ha[s] no right to consider." (Internal quotation marks omitted.) Id., 341–42. We address the defendant's claims of impropriety in turn.

A

The defendant first claims that the prosecutor improperly appealed to the jurors' emotions by emphasizing in his closing and rebuttal arguments certain comments that the defendant had made in the course of sexually assaulting S. We conclude that those remarks did not improperly appeal to the jurors' emotions.

The following additional facts are relevant to this claim. During his closing argument, when describing the incidents of sexual assault on S between March 30, 2003, and December 31, 2006, the prosecutor stated: "[The defendant] says—again, I apologize, but this is the testimony. He says the most vulgar, upsetting things. He says it during these acts. Whose pussy is this? She doesn't answer him. Don't give your pussy to anyone. This is a biological father talking [in] this way to his daughter." During his rebuttal argument, the prosecutor further stated: "There was never a motive established, again, through the cross-examination of any of these people what motive they may have had to come into court and testify, particularly [S] who took the brunt of this, as I've said several times now, and the defendant

State *v.* Gary S.

uttering the most vulgar and disgusting things to her while this is going on, this is—whose pussy is this, have you—don't give it up to anybody else, [and] have you had sex with anyone else.'' While describing the incident that took place in the summer of 2002, when S was able to fight off the defendant, the prosecutor stated: ''But she's able to successfully fight him off and he— he gets so angry and so frustrated, he says, well, fuck you, bitch. This is how he talks to a twelve year old, his own biological daughter.''

The defendant argues that the prosecutor's references to the defendant's language were irrelevant to the offenses with which he was charged, and, accordingly, the only possible reason for the prosecutor to mention such language was to appeal to the jurors' emotions, passions, and prejudices. The defendant further argues that the prosecutor's commentary that the defendant uttered ''the most vulgar, upsetting things'' and ''the most vulgar and disgusting things,'' and that ''[t]his is how [the defendant] talks to a twelve year old, his own biological daughter,'' was irrelevant and an improper personal attack on the defendant.

Our case law establishes that ''[a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors [that] are likely to skew that appraisal. . . . Therefore, a prosecutor may argue the state's case forcefully, [but] such argument must be fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom.'' (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 719, 793 A.2d 226 (2002).

Not only were the remarks in this case based on the evidence presented at trial, to which defense counsel

State *v.* Gary S.

posed no objection, but they also were relevant to the charges brought by the state. The prosecutor's remark that, during the incident in the summer of 2002, "[the defendant] gets so angry and so frustrated, he says, well, fuck you, bitch" is relevant to count four, the state's charge of attempted sexual assault of S during "an uncertain date in the summer of 2002," because it illustrates that the defendant had an intent to sexually assault S and became so frustrated that he addressed his own daughter in vulgar language when he was unsuccessful. Similarly, the prosecutor's reference to the defendant's comments regarding S's "pussy" while having vaginal intercourse with her is relevant to count five, charging sexual assault in the second degree, because it illustrates that the defendant and S engaged in sexual intercourse.[22] This reference is also relevant to count eight, charging risk of injury to a child, because it illustrates that the defendant caused S to have contact with his intimate parts in a sexual and indecent manner that was likely to impair her morals.[23]

In addition, the defendant's comments that S should not give her "pussy" to anyone but him are of a threatening nature and support the state's theory that S delayed in her disclosure of the sexual abuse because she was afraid of the defendant. In fact, all of the prosecutor's references support the state's theory that S also delayed in her disclosure because of the embarrassing nature of the incidents. See *State* v. *Felix R.*, 319 Conn. 1, 11, 124 A.3d 871 (2015) (prosecutor's remarks were proper when, "[a]lthough the underlying crime was, by its nature, inherently charged with emotion, the prosecutor . . . was summarizing evidence that supported [the

---

[22] "Sexual intercourse" is defined as "vaginal intercourse, anal intercourse, fellatio or cunnilingus between persons regardless of sex." General Statutes § 53a-65 (2).

[23] The term "intimate parts" is defined as "the genital area or any substance emitted therefrom, groin, anus or any substance emitted therefrom, inner thighs, buttocks or breasts." General Statutes § 53a-65 (8).

State *v.* Gary S.

state's] theory of the case'') Accordingly, contrary to the defendant's assertion, the prosecutor was not appealing to the jurors' emotions when he made those remarks; the defendant's vulgar statements had significant evidentiary value.

Likewise, we disagree with the defendant that the prosecutor's characterization of the defendant's comments as ''vulgar'' and ''disgusting,'' and the prosecutor's remark that ''[t]his is how he talks to a twelve year old, his own biological daughter,'' amounted to an impermissible personal attack on the defendant. We conclude that the prosecutor's commentary, which was based on S's testimony, was not so gratuitous, crudely phrased, or inflammatory as to rise to the level of an improper personal attack. But cf. *State* v. *Singh*, supra, 259 Conn. 721 n.27 (prosecutor's remark that ''[the defendant] acted innocent the whole time . . . but I submit to you that that shows the same kind of arrogance that you saw here'' was improper personal attack on defendant that was unsupported by evidence (emphasis omitted; internal quotation marks omitted)); *State* v. *Williams*, supra, 204 Conn. 546 (prosecutor's remarks during closing argument that defendant was, among other epithets, ''child-beater,'' ''baby-beater,'' ''evil man,'' and ''drunken bum,'' were improper personal attacks on defendant (internal quotation marks omitted)).

B

The defendant next claims that certain of the prosecutor's remarks constituted unsworn testimony and improperly vouched for the credibility of the state's witnesses. We conclude that some of the challenged remarks, but not all, were improper.

''A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the

State *v.* Gary S.

facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument.'' (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 717. Although prosecutors may not express opinions as to a witness' credibility, ''[i]t is not improper for [a] prosecutor to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the [jurors] the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. [A prosecutor] should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he [or she] is simply saying I submit to you that this is what the evidence shows, or the like.'' (Citation omitted; internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 465–66, 832 A.2d 626 (2003). A prosecutor may also comment on a witness' testimonial demeanor, as ''a witness' demeanor while testifying is visible to the jurors and properly before them as evidence of . . . credibility.'' (Internal quotation marks omitted.) *State* v. *Courtney G.*, supra, 339 Conn. 356.

The defendant first claims that the prosecutor's remark that ''[t]his isn't a case of let's get together and get our stories straight and make this up,'' was improper because the prosecutor vouched for the credibility of the state's witnesses. During his rebuttal argument, the prosecutor stated: ''Let's look at how this came about as well, none of these girls who testified, [T], [S], [A], who are all related to each other, discussed with each other what happened. This isn't a case of let's get together and get our stories straight and make this up. That was not the case.'' The defendant argues that the

State *v.* Gary S.

challenged remark amounted to unsworn testimony. We are unpersuaded.

The prosecutor's remark was based on evidence presented at trial, and he argued an inference that the jury might draw therefrom. T, S, and A all testified as to how the disclosures came about. As we noted previously, S testified that the first time she told T about the incident was in March, 2017. During that conversation, T revealed to S that the defendant also had sexually assaulted her. A few days later, with S not present, T told D about the assaults on both her and S, and A, who was present at the time, then revealed what had happened to her. There was no evidence presented that T, S, and A had conversations to conspire against the defendant prior to this chain of disclosures in 2017. Accordingly, the jury reasonably could have inferred, on the basis of this evidence, that T, S, and A had not coordinated the numerous accusations of sexual abuse that they ultimately levied against the defendant in March, 2017, out of some conspiratorial vengeance. See *State* v. *Stevenson*, 269 Conn. 563, 584, 849 A.2d 626 (2004) (prosecutor's comment "posited a reasonable inference that the jury itself could have drawn without access to the [prosecutor's] personal knowledge of the case").[24]

[24] Although the defendant argues that the prosecutor was improperly referring to the chain of disclosures that initially occurred in 2017, he also argues that the prosecutor's remark could have been an improper reference to the witnesses' preparations for trial. We disagree with this argument as well. First, after making that remark, the prosecutor immediately proceeded to discuss the specific chain of disclosures that occurred in March, 2017. Read in context, it is clear that the prosecutor was asking the jury to infer that T, A, and S did not "get together" prior to their disclosures in 2017. Second, even if some ambiguity remained with respect to that issue, we would not simply assume that such an improper form of argument was intended. See, e.g., *State* v. *Luster*, 279 Conn. 414, 441, 902 A.2d 636 (2006) ("a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations" (internal quotation marks omitted)).

State *v.* Gary S.

We also reject the defendant's contention that the prosecutor improperly relied on constancy of accusation evidence when making this remark.[25] In his closing argument, defense counsel attacked the state's case, in part, due to S's and A's delayed reporting of the sexual abuse. In response, the prosecutor appeared to use evidence of out-of-court statements, not for its substance, but, in accordance with the trial court's instruction, only "to negate any inference that [A] and [S] failed to tell anyone about the sexual [abuse] and, therefore, that [A's] and [S's] later assertion[s] could not be believed."[26]

The defendant next claims that the prosecutor's remark regarding S's "flat affect" while testifying was improper because it usurped the jury's role in judging S's credibility. During trial, the state called Catherine Lewis, a forensic psychiatrist, as an expert witness to testify regarding the effects of child sexual abuse on victims and the reasons for victims' delays in disclosing their experiences. While discussing the external expressions of trauma victims, Lewis noted that individuals who experience trauma can be "very flat." Specifically, Lewis testified: "So, what we do see, though, is less ability—you know, we see less ability to have normal—

---

[25] The defendant argues that the prosecutor improperly used evidence regarding S's and A's out-of-court statements about the incidents of sexual assault, which was admitted by the trial court under the constancy of accusation exception for prior consistent statements, for its substance.

[26] The state claims that the defendant's argument that the prosecutor violated the trial court's instruction regarding constancy of accusation evidence is an improper new claim raised for the first time in the defendant's reply brief. We disagree. The defendant does not cite new instances of impropriety in his reply brief. Instead, he raises a new argument in support of a preexisting claim of impropriety. See *Crawford* v. *Commissioner of Correction*, 294 Conn. 165, 197, 982 A.2d 260 (2009) ("[a]lthough the function of the appellant's reply brief is to respond to the arguments and authority presented in the appellee's brief, that function does not include raising an entirely *new claim of error*" (emphasis added; internal quotation marks omitted)).

State *v.* Gary S.

for example, normal affect, and that's, like, the external expression of emotional. So, traumatized people can be very flat. You know, they can be talking to you about very horrible things and just no emotion.'' Lewis had no familiarity with the case or the parties when she testified during the trial. At the conclusion of his closing argument, the prosecutor commented: ''I think it's fair to say, if you saw [S] testify, she had, you can infer, sort of a flat affect, if you watched her demeanor and the inflection in her voice and things of that nature.''

The defendant argues that the prosecutor unduly influenced the jury by commenting on S's demeanor and linking it to Lewis' testimony. We disagree. The prosecutor called on the jury to draw a reasonable inference from the evidence presented at trial, including S's testimonial demeanor and Lewis' testimony on the effects of trauma, that S's demeanor and inflection were consistent with the demeanor of individuals who have experienced trauma. See *State* v. *Courtney G.*, supra, 339 Conn. 355–56 (concluding that it was not improper for prosecutor to comment on witness' testimonial demeanor and to argue inferences to be drawn from facts in evidence). We find unavailing the defendant's argument that this is a matter requiring the jury to have special expertise, akin to that of making a psychiatric diagnosis.[27]

---

[27] The defendant further argues that this was an improper comment on the defendant's guilt. We are unpersuaded. The prosecutor's comment did not rise to the level of an improper opinion on the defendant's guilt, such as those that this court has previously condemned. See, e.g., *State* v. *Singh*, supra, 259 Conn. 721–22 n.27; see also *State* v. *Whipper*, 258 Conn. 229, 270, 780 A.2d 53 (2001) (prosecutor's remarks that ''[t]his is an overwhelming case of guilt . . . [the defendant] over there is guilty beyond all doubt'' was improper personal opinion by prosecutor regarding defendant's guilt (internal quotation marks omitted)), overruled in part on other grounds by *State* v. *Cruz*, 269 Conn. 97, 106, 848 A.2d 445 (2004), and *State* v. *Grant*, 286 Conn. 499, 535, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008).

State *v.* Gary S.

The defendant's final claim relates to the prosecutor's remarks during closing and rebuttal arguments that D could not explain why she remarried the defendant because she was exposed to trauma and is a victim of domestic violence. During closing argument, the prosecutor stated: "You know, using, again, your common sense and experience, if she's physically abused for years and all this, I think it's consistent to say [D] may be someone—considered as someone who has been exposed to much domestic violence or abuse for many years, things you can't explain. She says that she tends to black out traumatic stuff. This is how—maybe that's how she copes with it. Many people deal with something that traumatic and that pervasive over a long period of time." During his rebuttal argument, the prosecutor reiterated: "[D] can't explain why she married [the defendant] a second time. Again, emotionally none of us may ever understand this, maybe even intellectually, none of us may ever understand. But that's what happened, because I would submit, using your common sense and experience, she may be consistent with someone who is a classic domestic violence victim."

The defendant argues that the prosecutor's remarks ignored the trial court's express instruction to the jury, after granting a motion in limine, that the evidence of the defendant's abuse toward D was for a limited purpose: to explain why S and A had delayed in their disclosures of the sexual abuse.[28] We agree. Although a prosecutor has significant leeway in closing argument, evidence that properly was admitted at trial "may not be used for a purpose for which it was not admitted." *State* v. *Camacho*, 282 Conn. 328, 377, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273

---

[28] The state claims that the defendant's argument that the prosecutor violated the trial court's limiting instruction is also an improper new claim raised for the first time in a reply brief. We again disagree. See footnote 26 of this opinion.

State *v.* Gary S.

(2007). In the present case, the trial court admitted the prior misconduct of the defendant as it relates to D for the limited purpose of explaining why S and A had delayed in their disclosures of the sexual abuse that they experienced. The trial court instructed the parties that the evidence was not to be used for other purposes. As such, the prosecutor's remarks, which tie the defendant's misconduct to D's decision to remarry the defendant and her inability to explain why she did so, were improper because they violated the trial court's limiting instruction.[29]

C

Having determined that some of the prosecutor's remarks were improper, we now consider whether those specific remarks deprived the defendant of his due process right to a fair trial. In deciding whether an impropriety deprived the defendant of a fair trial, this court considers whether "(1) the impropriety was invited by the defense, (2) the impropriety was severe, (3) the impropriety was frequent, (4) the impropriety was central to a critical issue in the case, (5) the impropriety was cured or ameliorated by a specific jury charge, and (6) the state's case against the defendant was weak due to a lack of physical evidence." *State* v. *Fauci*, 282 Conn. 23, 51, 917 A.2d 978 (2007), citing *State* v. *Williams*, supra, 204 Conn. 540. We must ultimately determine if the prosecutorial improprieties "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process . . . ." *State* v. *Fauci*, supra, 26 n.2.

The prosecutor's remarks were not frequent or severe. During his lengthy closing argument, the prose-

_____

[29] The defendant also claims that the prosecutor's remarks constitute unsworn testimony because they are not based on reasonable inferences drawn from the evidence. Having already concluded that the prosecutor's remarks on this topic were improper, we need not reach this particular claim.

State *v.* Gary S.

cutor briefly insinuated that D could not explain her remarriage to the defendant because she was exposed to domestic abuse. During his rebuttal argument, the prosecutor then made a separate, isolated comment that D is a "classic domestic violence victim." See, e.g., *State* v. *Payne*, 303 Conn. 538, 567, 34 A.3d 370 (2012) (defendant's due process rights were not violated when prosecutor's statements were isolated and occurred within lengthy closing argument).

In addition, when evaluating severity, "we take into consideration whether defense counsel object[ed] to any of the improper remarks, request[ed] curative instructions, or move[d] for a mistrial." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 398, 897 A.2d 569 (2006). Defense counsel did not object to the prosecutor's misuse of the defendant's prior misconduct as it relates to D, a choice that "demonstrates that defense counsel presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." (Internal quotation marks omitted.) *State* v. *Wilson*, 308 Conn. 412, 449, 64 A.3d 91 (2013). The improper remarks were also counterbalanced by the trial court's instructions following closing arguments. At the conclusion of the trial, the trial court clearly and unequivocally instructed the jury that the evidence of the defendant's abuse toward D could only be used to explain why the victims had delayed their disclosures. See *State* v. *Ceballos*, 266 Conn. 364, 413, 832 A.2d 14 (2003) ("[i]n the absence of an indication to the contrary, the jury is presumed to have followed [the trial court's] curative instructions" (internal quotation marks omitted)).[30] As such, we con-

---

[30] After closing arguments concluded, the trial court instructed the jury as follows: "[T]he state offered evidence of the defendant's allegedly being physically abusive toward [D]. This evidence was admitted for a limited purpose only. The evidence is not being admitted to prove any bad character, propensity, or criminal tendencies of the defendant. Such evidence, if you believe it, is being admitted solely to explain why the alleged victims delayed in the responding of the alleged sexual abuse." The trial court gave an almost

345 Conn. 387 DECEMBER, 2022 419

State *v.* Gary S.

clude that the remarks were not so severe as to rise to the level of egregious conduct and were adequately addressed by the trial court's limiting instructions.[31]

We next consider whether the prosecutorial improprieties were central to critical issues in the case and whether the improprieties were invited by the defense. Although the credibility of the witnesses was a central issue and the remarks had some bearing on credibility, the defendant's reliance on centrality is counterbalanced by the fact that the defense, at least in part, invited the remarks. During closing argument, defense counsel argued that the state's case was weak because D had remarried the defendant and "the dates that [D gave did] not square with the dates that are charged and . . . the testimony of [S] and [A]." The prosecutor's remark in his rebuttal argument, although improper, appeared to be a response to defense counsel's argument that D's remarriage to the defendant and her recollection of dates that contradicted some of the dates provided by S and A, in turn, weakened S's and A's credibility.

Finally, we consider whether the state's case was strong. "[T]he sexual abuse of children is a crime [that], by its very nature, occurs under a cloak of secrecy and darkness. It is not surprising, therefore, for there to be a lack of corroborating physical evidence . . . . Given

_____

identical jury instruction after S testified to the incidents of domestic abuse against D that she had witnessed.

[31] In addition, the defendant's argument that the remarks regarding domestic violence amounted to the prosecutor's injecting his own views as to the credibility of witnesses is further counterbalanced by the court's jury instruction after closing arguments. The court stated: "You should also keep in mind that arguments and statements by the attorneys and final arguments or during the course of the case are not evidence. You should not consider as evidence their recollection of the facts, nor their personal beliefs as to any facts or as to the credibility of any witness, nor any facts that any attorney may have presented to you in argument from the attorney's knowledge that was not presented to you as evidence during the course of the trial."

State *v.* Gary S.

the rarity of physical evidence in [sexual assault cases involving children], a case is not automatically weak just because a child's will was overborne and he or she submitted to the abuse . . . . [W]e have never stated that the state's evidence must have been overwhelming in order to support a conclusion that prosecutorial [impropriety] did not deprive the defendant of a fair trial.'' (Citation omitted; internal quotation marks omitted.) *State* v. *Courtney G.*, supra, 339 Conn. 365–66.

In the present case, although there was no forensic evidence collected, the state presented numerous witnesses during trial. The jury heard testimony from S and A, who described in detail the assaults to which the defendant had subjected them. In addition, S, when testifying, provided the jury with an explanation it reasonably could have inferred was the reason for D's remarriage to the defendant and the resulting delay in S's disclosure—D always put men first before her children. The jury also heard testimony from T, who established the defendant's propensity to commit similar crimes of a sexual nature against other children in his family, and from E, a friend to whom S had disclosed the sexual abuse in the past. See footnote 7 of this opinion. Although the prosecutor's improper remarks related to D's credibility, the state's case, which included the testimony of S, A, and T, all three of whom had experienced the defendant's sexual abuse, was not overshadowed by those improper remarks as to D, especially considering the trial court's jury instructions. On this record, we are confident that the jury's verdict would not have been different in the absence of the prosecutor's improper use of the defendant's prior misconduct. See *State* v. *Warholic*, supra, 278 Conn. 396 (whether defendant is ultimately prejudiced ''depends on whether there is a reasonable likelihood that the jury's verdict would have been different [in the absence

State *v.* Gary S.

of] the sum total of the improprieties'' (internal quotation marks omitted)).

The judgment is reversed only with respect to count three of the information and the case is remanded with direction to render a judgment of acquittal on that count and to resentence the defendant on the remaining counts of conviction; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.